**HAYMAKER SPORTS, INC., Appellant,**

v.

**Herman TURIAN, Appellee.**

**Appeal No. 78–532.**

United States Court of Customs
and Patent Appeals.

Aug. 3, 1978.

Joel S. Goldhammer, Arthur H. Seidel, Philadelphia, Pa. (Seidel, Gonda & Goldhammer, P. C.) Philadelphia, Pa., attorneys of record, for appellant.

A. D. Caesar, Philadelphia, Pa. (Caesar, Rivise, Bernstein & Cohen, Ltd.) Philadelphia, Pa., attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE, and MILLER, Associate Judges.

MILLER, Judge.

This appeal is from a decision of the Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("board"), 197 USPQ 32 (1977), denying in part a petition by appellant, Haymaker Sports, Inc. ("HSI"),[1] to cancel the registration of the mark HAYMAKERS.[2] We reverse.

## Background

HSI is the owner of registrations for HAYMAKER[3] and CHARLES OF HAYMAKER[4] for women's sportswear such as shirts, skirts, blouses, dresses, suits, and slacks, and for women's jewelry. Earliest use in commerce of its marks was 1945. The original owner of the registration in issue, Avon Shoe Co. ("Avon"), first used the mark HAYMAKERS in commerce on shoes in 1941. In 1953 Avon brought suit[5] against HSI and its parent, David Crystal, Inc., to enjoin HSI's use of HAYMAKER on women's sportswear. The suit culminated in a judgment which, although likelihood of confusion was found from both parties' use of substantially identical marks, permitted each party to continue use of its respective mark on its respective goods. *Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607, 125 USPQ 607 (CA 2 1960).

As a result of this litigation, Avon was unable to pay its attorneys' fees and, upon their suit for collection in 1962, entered into an agreement on June 13, 1963, providing for certain "escrowees," Max Block (attor-

1. The board granted HSI's petition to cancel the registration of the mark HAYMAKERS BY AVON for abandonment through nonuse. That portion of the board's decision has not been appealed by either party.

2. Reg. No. 556,671, issued March 25, 1952, renewed, and section 8 affidavit accepted, for men's, women's, and children's shoes of leather, suede, canvas, fabric or composition, and combinations thereof.

3. Reg. No. 817,822, issued November 1, 1966, for women's outer shirts, skirts, blouses, outer shorts, jackets, dresses, suits, slacks, T-shirts, sweaters, romper bottom and bubble top combinations, combination skirt and short outfits, jumpers, shifts, playsuits, hats, socks, and cu-

lottes; Reg. No. 715,101, issued May 9, 1961, for women's outer shirts, skirts, blouses, outer shorts, jackets, dresses, suits, and slacks; Reg. No. 715,046, issued May 9, 1961, for women's jewelry—namely, cuff links, collar pins, tie pins, and studs.

4. Reg. No. 715,100, issued May 9, 1961, for ladies' and misses' dresses, skirts, coats, dress and jacket ensembles, suits, blouses, slacks, coveralls, and jumpers.

5. Avon also owned a subsidiary corporation, Haymaker Shoe Corp., which was a participant in the suit. For purposes of this appeal we will refer to both corporations as "Avon."

ney for Avon) and Eugene Moran (attorney for the unpaid attorneys), to be assigned Avon's mark HAYMAKERS as collateral security for payment. The pertinent portions of that agreement read:

*THIRD* : In addition to these aforesaid payments, the plaintiffs [unpaid attorneys] shall be entitled to receive, by payment to their attorney, EUGENE J. MORAN, an amount equal to five per cent. of the net profits before taxes of the defendant, [Avon] . . ., up to $25,000 and seven and one-half per cent. of the net profits before taxes of [Avon] . . . over and above the sum of $25,-000. The aforesaid percentages shall apply to the net profits before taxes of [Avon] . . . for its next five fiscal years and shall be payable to the plaintiffs by payment to their said attorney within ninety days of the close of each fiscal year of the said [Avon] . . ., beginning with and including the fiscal year 1962–1963 which began on October 1, 1962 and ending with the fiscal year 1966–1967.

.　　.　　.　　.　　.

*TENTH* : As collateral security for the payment of all moneys and the performance of all the terms and conditions of this agreement, AVON SHOE CO., INC. hereby agrees to assign, and simultaneously herewith has delivered an assignment, of all the right, title and interest which it may have in and to the certain trade-marks . . . together with the goodwill of the business of said AVON SHOE CO., INC. . . . now conducted by . . . [it] . . . in connection with which businesses the said trade-marks are now used. Said assignment shall be made in favor of MAX BLOCK, ESQ. and EUGENE J. MORAN, ESQ., as ESCROWEES . . . .. In the event that . . . AVON SHOE CO., INC. perform[s] all the terms and conditions required . . . said ESCROWEES shall return the aforesaid assignment to AVON SHOE CO., INC. or shall re-assign the aforementioned trade-marks to AVON SHOE CO., INC.

In the event of a default . . . ESCROWEES must assign the aforementioned trade-marks and goodwill to the plaintiffs [Corey, Hart & Stemple] and plaintiffs may thereafter sell, assign or transfer all right, title and interest in and to said trade-marks and goodwill.

The assignment, executed the same date on behalf of Avon, covered—

all and any right, title and interest which it may have in and to the certain trade-marks "HAYMAKERS" and "HAYMAKERS BY AVON" registered in the United States Patent Office under Nos. 556,671 and 571,010 on March 25, 1952 and February 24, 1953, respectively, together with the goodwill of the [business] . . . of [Avon] . . . now conducted by [it] . . . in the City, County and State of New York and at other places throughout the United States in connection with which [business] . . . the said trademarks are now used.

Avon continued using the mark on shoes it manufactured, but its business declined. A default resulted when it was unable to make payment under the terms of the agreement. Pursuant to the agreement, Block and Moran then recorded the assignment to the unpaid attorneys (Corey, Hart & Stemple) in the PTO on March 26, 1964. A week later, the parties entered into a second agreement. Like the first agreement, this stipulated that the mark had been assigned as collateral security for payment, set up a new payment schedule, and included a new provision, which read:

*EIGHTEENTH* : In the event the corporate defendants shall permanently cease to do business, then and in that event any of the owners of stock of either of said corporations shall have the right to continue the minimum payments provided for in this stipulation and, upon payment by said owners of stock of the total minimum herein provided, the security . . . shall be re-assigned by the ESCROWEES to the individuals making the said minimum payments.

By late 1967, Avon had ceased operations altogether and had defaulted on the second

agreement. In July 1968, Turian, as a stockholder of Avon, paid off the outstanding debt to Block and Moran, who then assigned him the registration.[6] Since then, Turian or corporations owned by Turian have used the mark HAYMAKERS on shoes (either manufactured by his corporations or imported by him).

### Board

The board found that the prior litigation between HSI and Avon did not preclude it from considering HSI's petition to cancel. It said that "the factual situation which the Court concluded existed in 1960 no longer exists and there are now different marketplace and factual elements that must be considered," one of which involved the question whether Turian or any of his predecessors had abandoned the mark HAYMAKERS. The board found that under the first agreement between Avon and its creditors, the parties clearly did not intend that the assignment have any immediate legal effect and that an agreement for the *future* assignment of a trademark is not an outright assignment. With respect to Avon's default and the recording in the PTO of the assignment to Block and Moran, the board found that the second agreement between the parties a week later "resurrected" the assignment as collateral for Avon's performance and impliedly granted Avon a license to continue to use the mark in its business operations.

As to the assignment from Block and Moran to Turian, the board found no significance in Turian's acquisition of none of the "salient accouterments" of Avon's business because he knew the names of Avon's customers and did not need the shoe lasts or machinery. After noting that Turian, as a stockholder, had paid off the outstanding debt of Avon pursuant to the eighteenth paragraph of the second agreement, the board said:

> Under these circumstances, it is our opinion that the assignment in question was not invalid as an assignment in gross and that respondent received a valid and legal title to these trademarks.

### OPINION

■ Turian urges that HSI is estopped from asserting any damage from his use and registration of the mark because of the previous litigation between the parties in *Avon Shoe Co. v. David Crystal, Inc., supra.* However, the basis of the court's decision in the prior case to permit concurrent use by the parties rested, at least in part, on the existence of a valid, federally registered mark to Avon and Avon's position as senior user. HSI had no opportunity to raise the issue of validity of the two subsequent assignments. Additionally, circumstances in the marketplace have changed since 1960. Avon suffered declining business and finally ceased operations, while HSI has continued to expand its business and actively promote its marks. We agree with the board that such changed circumstances preclude application of the doctrine of collateral estoppel. *Accord, Old Grantian Co. v. William Grant & Sons,* 361 F.2d 1018, 53 CCPA 1257, 150 USPQ 58 (1966); *see In re Superior Outdoor Display, Inc.,* 478 F.2d 1388, 178 USPQ 151 (CCPA 1973).

■ HSI argues that the assignment from Block and Moran to Turian was invalid as an assignment in gross because, at most, all Block and Moran had to convey was bare legal title. It cites section 10 of the Lanham Act, 15 U.S.C. § 1060, which provides that a registered mark "shall be assignable with the goodwill of the business in which the mark is used." HSI's position also finds support in the following statement of the Supreme Court in *United Drug Co. v. Rectanus Co.,* 248 U.S. 90, 97–98, 39 S.Ct. 48, 51, 63 L.Ed. 141 (1918)—

> There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . . its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product

6. The assignment was recorded in the PTO on November 22, 1968.

as his; and it is not the subject of property except in connection with an existing business. *Hanover Milling Co. v. Metcalf*, 240 U.S. 403, 412–414, 36 S.Ct. 357, 60 L.Ed. 713 [1916].

The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly.

In determining whether the requisite transfer of goodwill accompanied the transfer of the mark from Avon to Block and Moran, we note that the board gave no reasons to support its conclusion that the assignment recorded in the PTO "was not invalid as an assignment in gross." However, important events had occurred *which changed the relationship of the parties after Avon's default.* No longer was the "assignment" a mere agreement to assign the mark sometime in the future in the event of default, as the board had found. Default had occurred, the "assignment" had been recorded in the PTO, and legal title to the mark had passed to Block and Moran. Contrary to the board's conclusion, after the recordation in the PTO, it was too late to "resurrect" the agreement to assign the mark sometime in the future. Thus, the facts of this case are unlike those in *Li'l' Red Barn, Inc. v. Red Barn System, Inc.*, 322 F.Supp. 98, 167 USPQ 741 (N.D.Ind. 1970), *aff'd per curiam*, 174 USPQ 193 (CA 7 June 2, 1972), where no default occurred and no assignment was ever recorded in the PTO. Notwithstanding that the agreement recited pro forma that goodwill was transferred along with the mark, Block and Moran never played an active role in the business of Avon, never used the mark themselves, and never acquired any tangible assets or goodwill of Avon. Therefore, we conclude that, as a matter of substance, the assignment was invalid as an assignment in gross, rendering the latter assignment to Turian also invalid.[7]

 Even if we were to conclude that the assignment from Avon to Block and Moran was valid, the "inherent" license back to Avon found by the board would have been nothing more than a mere naked license. A licensor may license his mark if the licensing agreement provides for adequate control by the licensor over the quality of goods or services produced under the mark by a licensee. 1 J. McCarthy, *Trademarks and Unfair Competition* § 18:14 (1973), and authorities cited therein.[8] The purpose of such a requirement is to protect the public from being misled. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367, 121 USPQ 430, 437 (CA 2 1959). *See* 15 U.S.C. §§ 1055, 1127. Uncontrolled licensing of a mark results in abandonment of the mark by the licensor. *See E. I. duPont de Nemours & Co. v. Celanese Corp. of America*, 167 F.2d 484, 35 CCPA 1061, 77 USPQ 364 (1948); *see also, Dawn Donut Co. v. Hart's Food Stores, Inc., supra* at 367, 121 USPQ at 436 (CA 2 1959). Here, Block and Moran were holders of mere legal title to the mark. They had no interest in the quality of shoes Avon was manufacturing, and there is no evidence that they exercised any quality control. Although quality control has been inferred in a few cases where licensing agreements were silent,[9] there is

---

7. This court's decisions in *Glamorene Products Corp. v. Proctor & Gamble Co.*, 538 F.2d 894, 190 USPQ 543 (Cust. & Pat.App.1976); *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 58 CCPA 1172, 169 USPQ 590 (1971); and *Hy-Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947, 49 CCPA 1163, 133 USPQ 687 (1962), do not compel a contrary conclusion. In each of those cases the assignees of the respective marks began immediately to use the marks. Block and Moran, as the assignees of the HAY-MAKERS mark, never made use of it.

8. In § 18:17B at 640, McCarthy states:
 Merely because reliance on the licensee's own self-interest has not resulted in a varia-

tion of quality in the past does not necessarily mean that such a situation will continue forever. It is difficult to see how the licensor can fulfill his duty to take reasonable steps to control quality merely by leaving the job up to the licensee.

9. *See Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 330 F.2d 667, 670, 141 USPQ 281, 284 (CA 7 1964) (quality control found where agreement had been in effect over forty years, and licensor had received no complaints from customers concerning quality) and *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 166 USPQ 312 (S.D.N.Y.1970), *aff'd*, 437 F.2d 566, 169 USPQ 1 (CA 2

nothing in the record before us on which to base such an inference.

■ Turian's argument that the assignment from Avon to Block and Moran was valid because Block and Moran occupied a position analogous to a trustee in bankruptcy must fail. Although it is a general rule that a trustee in bankruptcy, 87 C.J.S. *Trade-marks, Trade-names, and Unfair Competition* § 174 (1955), or an assignee for benefit of creditors, 6 Am.Jur.2d *Assignments for Benefit of Creditors* § 25 (1969), may validly assign a trademark, the position of Block and Moran as holders of only bare legal title to the mark is not comparable to that of such a trustee or assignee. Block and Moran did not succeed to *all* of the assets of Avon upon default; rather, the tangible business assets and goodwill remained at all times with Avon. An assignee for benefit of creditors or trustee in bankruptcy succeeds to *all* assets, both tangible and intangible, and for this reason can validly assign trademark rights with appurtenant goodwill and assets to a subsequent purchaser for value. *See* 1 J. McCarthy, *supra*, § 18:9 at 622–23; Annot., 44 A.L.R. 706 (1926), and cases cited therein.

In view of the foregoing, the decision of the board is *reversed*.

*REVERSED.*

BALDWIN, Judge, dissenting, with whom RICH, J., joins.

I respectfully dissent from the majority's decision based, as it is, on a conclusion that the assignment from the Avon Shoe Co. (Avon) to the escrowees, Block and Moran, constituted an assignment in gross of the trademark HAYMAKERS and, thus, rendered invalid the subsequent assignment from the escrowees to appellee, Herman Turian (Turian).

Knowledge of the facts as set forth in the record is critical to a proper understanding of the nature of the transactions between the parties. Avon [1] was a closely held corporation which had manufactured and sold shoes under the trademarks HAYMAKERS and HAYMAKERS by AVON since 1941. Federal registration had been obtained by Avon for both marks.

In the early 1960's, Avon found itself in financial difficulties and unable to pay some $40,000 in legal fees arising from previous litigation with the appellant. In 1963, Avon and its creditor/attorneys entered into an agreement whereby the debt would be paid in installments based upon a percentage of Avon's net profits. Additional terms of the agreement designated Block and Moran as escrowees for the purpose of collecting the amounts payable to the creditor law firm.[2] Under the agreement, the marks and their attendant goodwill were assigned by Avon to Block and Moran to serve as collateral security for the debt. The record clearly shows that Avon, the escrowees and the creditor/attorneys intended Avon to continue to use the marks in its business and that placing the marks in escrow was merely a means to prevent Avon from transferring the marks or dissipating the considerable goodwill which it had engendered in the marks. In the event of breach by Avon, the agreement directed the escrowees to assign the trademarks and their associated goodwill to the creditor law firm.

The parties performed under this agreement until early 1964 when Avon defaulted. On March 26, 1964, the assignment from Avon to the escrowees was recorded in the Patent and Trademark Office. The escrowees, however, did not reassign the marks to

---

1971) (product produced pursuant to regulation by United States Food and Drug Administration).

1. Avon is used in this opinion to refer to both Avon Shoe Co. and a wholly owned subsidiary, Haymaker Shoe Corp.

2. Eugene J. Moran was the attorney for the creditor law firm and Max Block, Jr. had been Avon's attorney during the previous litigation between Avon and Haymaker Sports, Inc.

the creditor law firm as the default provision of the agreement provided, but rather Avon and the creditor law firm agreed to a new payment schedule. This was accomplished in a second written agreement which reaffirmed the roles of Block and Moran as escrowees and provided that should Avon cease business operations, the escrowees were to assign the marks to any owner of Avon stock who would consent to continuing the payments. Avon's business came to an end in late 1967 when only $1,800 of the debt was still outstanding.[3]

In early 1968, Turian,[4] as an owner of Avon stock, entered into negotiations with the escrowees and the marks were assigned to him on July 11, 1968. Turian paid the remaining debt in August of 1968 and began to use the mark HAYMAKERS in late 1968 or early 1969 in connection with the sale of shoes.

The majority opinion focuses entirely on the trademark assignment from Avon to the escrowees and reasons that it was an assignment in gross because the escrowees never used the marks and did not acquire any of Avon's business, equipment or inventory as part of the goodwill associated with the marks. On this basis, the majority concludes any subsequent transfer of title to the marks by the escrowees would also be "in gross" because the escrowees could transfer only bare legal title to the marks. I submit that this analysis fails to consider the assignment in the context of the actions of the parties involved. Consideration of these actions reveals the actual intent and effect of the agreements variously between Avon, the escrowees, the creditor law firm and Turian and leads me to the conclusion that, as a result of these actions, Turian acquired valid ownership of the marks and their associated goodwill.

In *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 166 USPQ 312 (S.D.N.Y.1970), the court stated the rationale for the requirement that a trademark must be transferred only in association with its goodwill was "the need, if consumers are not to be misled as a result of established associations with the mark, that the mark continue to be associated with the same or closely similar products after its assignment." *Id.* at 55, 166 USPQ at 319. I certainly disapprove of any assignment which enables the assignee to mislead and defraud the public by associating a trademark with a substantially different business, product or goodwill. 1 J. McCarthy, *Trademarks and Unfair Competition*, § 18:1C (1973). But I feel all of the important circumstances surrounding an assignment must be considered before it is determined to be "in gross" in order to avoid an erroneous finding of invalidity because of a mere failure to comply with stereotyped formalities. *Syntex*, supra at 54, 166 USPQ at 319.

The record before us is replete with evidence that the parties intended the first agreement and the assignment to constitute an assignment of the mark to the escrowees and a simultaneous license for Avon. The words of the assignment stated Avon "does sell, assign, transfer and set over unto EUGENE J. MORAN and MAX BLOCK, JR., as ESCROWEES * * * any right, title and interest [in the marks]." The very designation of Block and Moran as escrowees manifests an intent by the parties that Avon enjoy full use of the mark. The testimony of both Block and Moran on the record also establishes that Avon was to use the marks as a licensee.

While generally the mere provision that an assignment of a trademark also conveys the goodwill associated with the mark is insufficient to constitute a valid assignment, I find the actions of the parties in this case resulted in a valid assignment with a license back to Avon. Avon was both assignor and licensee of the marks and

---

3. The amount of the original debt had been reduced to $14,000 by agreement of the parties.

4. Turian was vice president of Haymaker Shoe Corp. until sometime in 1963 or 1964. His signature appeared on the assignment from Avon to the escrowees. Turian's father appears to have controlled the operation of both Avon Shoe Co. and Haymaker Shoe Corp. and Turian's stock holdings in Avon date back to the 1940's.

since Avon was to continue its use of the mark there was no need to transfer equipment, inventory or facilities to the escrowees. The end result of the transactions was that any purchaser of HAYMAKERS shoes received precisely what was bargained for, i. e., shoes manufactured and sold by Avon.

The majority finds the hiatus between the recording of the assignment on March 26, 1964 and the execution of the second agreement on April 7, 1964 as somehow significantly altering the relationship between Avon and the escrowees. Initially, I note that the recording provision in the statute is merely a device for providing constructive notice to potential bona fide purchasers. 1 J. McCarthy, *Trademarks and Unfair Competition*, § 18:2 (1973). Next, there is no evidence on the record that the escrowees terminated Avon's license and, thus, the status quo was maintained. Also, the second agreement reaffirmed the license agreement in the provision controlling disposition of the mark should Avon cease business operations, and this further emphasizes that these events did not affect Avon's right to use the marks.

When a trademark is licensed, the general rule is that the licensor must exercise control over the quality of the goods which the licensee sells in connection with the mark. J. McCarthy, supra § 18:14. Courts have, however, approved of certain licensing arrangements wherein the licensor relied upon the licensee to maintain the quality of the goods. *Id.* at § 18:17 and cases cited therein. I find the instant situation to be such an exception. Avon had continually used the marks for over twenty years and had established considerable goodwill in the marks. The assignment to the escrowees was temporary and was only to continue until such time as Avon paid off the debt. Also, Avon intended to reacquire the mark and, therefore, it possessed an obvious interest in maintaining its reputation of quality. These factors, when considered with Avon's long time experience in the shoe manufacturing business and the lack of any showing of a deterioration in the quality of the shoes, demonstrate that Avon was in the best position to control quality and that it was clearly reasonable for the escrowees to rely thereon. Thus, I find the assignment to the escrowees and the license back to Avon were in full compliance with federal trademark law governing registrations and assignments.

The final issue to be considered is the effectiveness of the assignment of the marks to Turian after Avon had ceased business operations. The majority's limited treatment of this issue concluded the assignment to be invalid because they found the earlier assignment to the escrowees invalid. The board, however, having found a valid assignment to the escrowees, considered the assignment to Turian in more depth, including the fact that Turian did not acquire Avon's equipment, inventory or customer lists as tangible symbols of goodwill. As was stated by the Court in *Syntex*, the assignee need not always acquire such assets. *Syntex*, supra at 55, 166 USPQ at 319. In *Syntex*, as here, the assignor did not possess unique equipment or secret information which, if not transferred to the assignee, would prevent him from duplicating the products and completely satisfying the expectations of purchasers familiar with products associated with the mark before the assignment. The record in this case demonstrates that Turian had been involved in the shoe business since the 1940's and as a former officer of Avon was thoroughly familiar with its product line, customers and business practices. I find in these factors a great deal more significance than a failure to acquire some sock linings, out of date shoe lasts and equipment for which Turian had no need.

I agree with the board's opinion that Turian succeeded to complete ownership of the HAYMAKERS trademark through an unbroken chain of title. I would affirm the decision of the board denying appellant's petition to cancel the registration.