689 F.2d 666
 216 U.S.P.Q. 11
 The MONEY STORE, a New Jersey corporation,
Plaintiff-Appellant-Cross-Appellee,
v.
HARRISCORP FINANCE, INC., an Illinois corporation,
Defendant-Appellee-Cross- Appellant.
 Nos. 81-2937, 81-3002.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 24, 1982.
Decided Sept. 20, 1982.
 
 Daniel W. Vittum, Jr., Kirkland & Ellis, Chicago, Ill., for plaintiff-appellant-cross-appellee.
 Dean A. Olds, Hume, Clement, Brinks, William & Olds, Ltd., Chicago, Ill., for defendant-appellee-cross-appellant.
 Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and FOREMAN, Chief District Judge.*
 PELL, Circuit Judge.
 
 
 1
 The Money Store, the plaintiff-appellant in this action, appeals from the district judge's cancellation of its federally registered service mark,[1] "THE MONEY STORE," and the issuance of a permanent injunction against utilization of the mark by the plaintiff in the defendant's market area. The appellant also challenges the district court's award of attorneys' fees to the defendant pursuant to 15 U.S.C. § 1120 (1976).
 
 
 2
 On cross-appeal, the defendant, Harriscorp Finance, Inc. (Harriscorp), challenges the district court's holding that "THE MONEY STORE" is suggestive rather than merely descriptive, that the plaintiff's action is not barred by laches and/or estoppel, and that the assignment of rights in the mark from United Bank of America (United Bank or United) to Harriscorp was ineffective because no goodwill passed pursuant to the assignment. The cross-appellant also challenges the district judge's refusal to grant the full amount of claimed attorneys' fees.
 
 
 3
 The principal issues on this appeal are: (1) whether the district judge correctly concluded that the plaintiff-appellant acted fraudulently in asserting that to the best of its knowledge and belief, no other person had the right to use the mark, "THE MONEY STORE," in commerce at the time the plaintiff applied for federal registration; (2) whether the mark is suggestive or merely descriptive; (3) whether the present action is barred by laches or estoppel; and (4) whether Harriscorp is a good faith junior user of the mark pursuant to the assignment from United.
 
 I. FACTS
 
 4
 A. The Plaintiff and Its Adoption of the Service Mark
 
 
 5
 The Money Store, plaintiff-appellant in this action, is a New Jersey corporation which offers a range of lending and financial services. The corporation was originally organized as Modern Acceptance and subsequently changed its name to The Money Store.[2] In 1972, Modern Acceptance's advertising manager wanted to create a unitary advertising image for Modern Acceptance and its three subsidiaries which then operated under different names. "THE MONEY STORE" was chosen as the company's service mark, and the plaintiff began using that mark on January 2, 1972, at its New Jersey and Pennsylvania offices and in newspaper and radio advertisements.
 
 
 6
 Costa, the advertising manager, was authorized to determine whether the mark could be registered nationally. He consulted Robert Paulson, a New York attorney specializing in trademark law. Paulson obtained a trademark search. This search indicated no federal registrations or other interstate uses of "THE MONEY STORE" in connection with money-lending services. The search did disclose a pending application for federal registration of the mark for advertising and public relations services filed by Henry J. Kaufman & Associates (Kaufman). The search also disclosed the following state registrations: "THE MONEY STORE" for financial and insurance services, registered since 1959 in Utah by Peoples Finance & Thrift Co. of Salt Lake City, Utah (Peoples); "THE MONEY STORE SERVICE" for insurance and financial services, registered since 1966 in Virginia by Diversified Mountaineer Corporation (Diversified); "THE MONEY STORE" for advertising services, registered in West Virginia since 1965 by Diversified; and "THE MONEY HOUSE" for services regarding money and loans, registered in Minnesota since 1963 by Wilson Loan Plan, Inc.[3]
 
 
 7
 Paulson concluded that "THE MONEY STORE" was eligible for federal registration by the plaintiff because of the differences between plaintiff's services and those offered by Kaufman and because of the intrastate character of those "MONEY STORE" registrations pertaining to financial services. Paulson so advised the plaintiff, noting that the holders of state registrations of the mark might have superior rights over the plaintiff in their local areas.
 
 
 8
 Before Costa actually filed the application for federal registration, he received a telephone call from a Kaufman representative who offered him an advertising package for banking institutions using "THE MONEY STORE" mark. Kaufman said that no money lending had yet been conducted in association with his project but that he anticipated a bank in Indiana would be using the package shortly. He also mentioned advertisements utilizing the mark in Bank Ad News and Bank Ad Age. The latter advertisement had run for the first time in 1971.
 
 
 9
 Costa told Paulson of this conversation. Paulson said that, because Modern Acceptance had commenced interstate use of the mark for money lending services prior to Kaufman's use for such services, it should pursue the application for federal registration. Paulson noted that the scope of rights Modern Acceptance would obtain in the mark might depend in part on whether Kaufman had amended its application to cover financial services.
 
 
 10
 An officer of Modern Acceptance subsequently applied for federal registration. The application which he executed included the statutory oath that:
 
 
 11
 (N)o other person, firm, corporation, or association, to the best of his knowledge or belief, has the right to use such mark in commerce either in the identical form thereof or in such near resemblance there as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive.
 
 
 12
 15 U.S.C. § 1051 (1976). The application was filed on February 4, 1972. The United States Patent and Trademark Office (Patent Office) found no conflict with the Kaufman mark which had in the interim become federally registered. The plaintiff's application was published for opposition; no one responded. Registration for "THE MONEY STORE" issued to Modern Acceptance on April 2, 1974.
 
 
 13
 The plaintiff's business increased dramatically after adoption of the mark, both in terms of the amount of money it lent and the geographic area in which it operated under "THE MONEY STORE" mark.
 
 
 14
 B. The Defendant and Its Adoption of the Service Mark
 
 
 15
 Defendant-appellee Harriscorp is a Delaware corporation. It is a wholly owned subsidiary of Harris Bank corporation and an affiliate of Harris Bank. In 1972, Theodore Roberts, the principal Harris executive responsible for the Harriscorp Finance retail lending project, selected "THE MONEY STORE" as his preferred name for money-lending service facilities the Bank planned to open in the metropolitan Chicago area. A trademark search conducted in mid-1973 disclosed the state registrations that had also been revealed by Modern Acceptance's search. Kaufman's registration and Modern Acceptance's pending application were also disclosed in the search. Because Harris found no evidence of any use of "THE MONEY STORE" in the Chicago area, it tentatively decided to use the mark.
 
 
 16
 In September 1972, Roberts learned that United Bank in Chicago was using "THE MONEY STORE" mark. United had first used the mark in August, 1972, eight months after the plaintiff's first use. In January, 1974, United assigned its rights in the mark to Harris. Although the evidence indicated that United had decided to discontinue use of the mark, it similarly indicated that United was still using "THE MONEY STORE" at the time of the assignment. In fact, at the time of the assignment, United was featuring the marks on three billboards located on major Chicago streets. The assignment recited that "for good and valuable consideration, the receipt of which is hereby acknowledged ... (the mark is assigned) together with the goodwill of the business symbolized by the mark." Harris did not acquire customer lists, real estate, receivables, accounts or any other tangible assets in return for the one dollar consideration it actually paid to United.
 
 
 17
 Having obtained the assignment from United, Harris made a final decision to use the mark and in December, 1974, Harriscorp opened three lending offices in the Chicago area utilizing the mark "THE MONEY STORE."
 
 
 18
 In January, 1975, Modern Acceptance sent Harriscorp a letter requesting it to cease and desist from using the mark. After a five-month exchange of letters between the parties, a meeting was held in New York. This meeting did not resolve the dispute. For the next twenty-two months, Modern Acceptance did not communicate with Harriscorp regarding use of the mark. During that period, the defendant expended a considerable sum to advertise the mark. Harriscorp made numerous business decisions, allegedly based on its conclusion that its use of "THE MONEY STORE" would not be challenged. In April, 1977, the plaintiff renewed its infringement claim and the instant suit was filed in August of that year.
 
 II. THE OATH
 
 19
 The judge below enjoined plaintiff's use of the mark in the Chicago area, cancelled the plaintiff's registration pursuant to 15 U.S.C. § 1064 (1976), and awarded damages pursuant to 15 U.S.C. § 1120 (1976), because he believed that the plaintiff had "made a false and fraudulent oath that no person, to the best of its knowledge and belief, had the right to use the mark in commerce." The district judge so held because he concluded that Peoples and Kaufman were prior users of the mark, "THE MONEY STORE," that the plaintiff was aware of this usage at the time its representative signed the oath, that the plaintiff had no reason to believe that these prior users were not using the mark in commerce, and that Modern Acceptance "intentionally failed to make the simple inquiries that would have revealed the facts."
 
 
 20
 Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages. E.g., Skippy, Inc. v. CPC International, Inc., 210 U.S.P.Q. 589, 594 (E.D. Va. 1980), rev'd in part on other grounds, 674 F.2d 209 (4th Cir. 1982); Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co., 339 F.Supp. 973 (M.D. Tenn. 1971), aff'd on other grounds, 470 F.2d 975 (6th Cir. 1972). Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark. Schwinn, 339 F.Supp. at 983.
 
 
 21
 We must first determine whether the Act obligates one seeking federal registration of a mark to investigate and report to the Patent Office regarding all other possible users of an identical or confusingly similar mark. The Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051-1127 (1976) (Lanham Act or Act), itself largely resolves this question. First, we examine the procedures relevant to registration under the Act.
 
 
 22
 When one files an application for federal registration of a mark, he indicates the class of services in which the mark is to be used. See id. § 1115(a). For instance, Modern Acceptance specified that it intended to use the mark for "money lending services" which fell within Class 102. Registration must be denied if the mark
 
 
 23
 so resembles a mark registered in the Patent and Trademark Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.
 
 
 24
 Id. If, on the basis of the examination, it appears that the applicant is entitled to registration, the mark is published in the Official Gazette of the Patent Office. Id. § 1062(a). Within thirty days following such publication, anyone who believes he would be damaged by registration of the mark may file in opposition to the registration. Id. § 1063. Even one who does not oppose registration pursuant to the provisions of section 1063 may later seek cancellation pursuant to section 14 of the Act, id. § 1064. Five years after registration of the mark, however, the mark is "incontestable" by private parties, id. § 1064(a), unless it is alleged to be a generic term, an abandoned mark, or unless the registration was obtained fraudulently or in violation of certain sections of the Act. Id. § 1064(c). Finally, section 17 of the Act provides for notification of the relevant parties and invocation of a Trademark Trial and Appeal Board by the Commissioner "(i)n every case of interference,[4] opposition to registration, application to register as lawful concurrent user, or application to cancel the registration of a mark." Id. § 1067.
 
 
 25
 Nowhere does the Lanham Act specifically mandate a preapplication search by one who seeks federal registration of a mark. The language of section 17 does not explicitly place such a burden on a potential registrant. To imply the duty, either from that section or from the declaration of exclusive rights, id. § 1051(a), would appear inconsistent with the statutory scheme. First, implication of such a duty would be a disincentive for the first user of a mark in interstate commerce to seek federal registration. His rights to the mark would be equally protected if he remained idle until a junior user obtained federal registration. The prior user could seek cancellation of the registration on the grounds that the junior user, in failing to discover the prior use, perpetrated a fraud on the Patent Office. Such a result is obviously at odds with the Act's purpose of conditioning exclusive nationwide rights in a mark on federal registration.
 
 
 26
 Second, creation of such a duty diminishes the importance of the role played by the Trademark Examiner and by those who might otherwise oppose registration of the mark following publication. See id. §§ 1052(d), 1062(a), 1063. These sections are important because they encourage the disclosure of potentially confusing trademark usages before the marks have become established in the mind of the consuming public. Placing the burden of investigation on a junior user makes a senior user's early opposition to registration unnecessary. The senior user can even challenge the junior user's registration after five years because a fraudulently obtained mark is not protected by the incontestability provision, id. §§ 1064(a) and (c). Further, the senior user can recover any damage he might have suffered, id. § 1120, arguably including even his attorney's fees.
 
 
 27
 The Act provides three opportunities for establishing potential confusion due to prior use of a similar mark for similar services: first, by the Trademark Examiner; second, by a prior user before the mark is registered; and third, by a prior user after the registration has issued. This three-tiered scrutiny encourages the disclosure of conflicting uses as early as possible and allocates a portion of the obligation to protect the rights of senior users to those persons or entities who claim such rights. Placing a burden of investigation on one seeking registration disturbs this scheme. The results are: (1) a disincentive for the first user of a mark in interstate commerce to seek federal registration; and (2) a greater possibility of customer confusion resulting from a scheme in which a senior user has no reason to ascertain and contest another's use of his mark at an early date. We believe that these results are inconsistent with the statutory scheme and with the purpose underlying the Lanham Act.
 
 
 28
 We do not suggest that a preapplication search is unwarranted. A recognized commentator has stated the role of such a search: "Thus, to avoid expensive and time consuming legal battles over registration or over common law rights, the company may want its trademark attorney to have a preliminary search conducted to see whether the proposed mark conflicts with pre-existing rights." McCarthy, Trademarks and Unfair Competition § 19:2, at 656 (emphasis added).
 
 
 29
 In the present case, Modern Acceptance had counsel conduct a preapplication search. The court below believed that the plaintiff had a duty to investigate further the uses by Peoples and Kaufman that were revealed by the search. We disagree. The question remains, however, whether the plaintiff can be found to have acted fraudulently because of the knowledge it did possess at the time its representative signed the statutory oath.
 
 
 30
 Modern Acceptance knew that Kaufman had a pending registration for the identical mark in Class 101, "Advertising and Business Services." Costa had learned that the Kaufman advertising scheme was aimed at lending institutions, that an advertisement using the mark had run in a banking journal as early as 1971, and that the advertising package would most probably be utilized by an Indiana institution in the near future.[5]
 
 
 31
 The question whether Kaufman's pending registration in Class 101 precluded Modern Acceptance from seeking registration in Class 102 is important. Counsel Paulson's second opinion letter to the plaintiff noted that Kaufman "may have amended their application ... (to allege) that their usage of the mark 'THE MONEY STORE' is for money-lending services." There is no indication that either Modern Acceptance or its counsel then knew that such amendment had occurred; further, there is nothing in the record of this case indicating that Kaufman had in fact amended its application. We do not think it unreasonable for Modern Acceptance, upon the advice of counsel, to have believed that Kaufman's pending registration for advertising services gave Kaufman no prior rights in the mark for money-lending purposes. See 15 U.S.C. § 1115(a) (1976); Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc., 253 F.2d 431, 433 (C.C.P.A. 1958). A contrary conclusion would suggest that by registering a mark in the class pertinent to advertising services, the registrant would have a superior right to utilize the mark in advertising any kind of service. We doubt that a Class 101 registration was intended to have such broad scope. One uses a trademark essentially to "advertise" a service or product. Reading a Class 101 registration broadly would essentially allow a registrant in that class to assert superior rights over any user of the same mark, even if the second user's service or product were so different from that of the registrant that consumer confusion was unlikely. Further, the Trademark Examiner who investigated other uses of "THE MONEY STORE" pursuant to Modern Acceptance's application was aware of the Kaufman application and found no interference, see 15 U.S.C. § 1066 (1976).
 
 
 32
 Peoples' use of the identical mark was registered only in Utah. There was no indication that Peoples was doing business outside of that state. Although the issue is not before this court, it is most likely that Modern Acceptance could not use its mark in Utah. We have found no authority, however, for the proposition that one cannot obtain federal registration of a mark that is registered and used in a single state.[6]
 
 
 33
 Neither the rights of Kaufman nor Peoples are before this court and we intend to express no view as to those companies' rights in the mark in comparison to the rights enjoyed by Modern Acceptance. We cannot find, however, any evidence that Modern Acceptance intended to mislead the Patent Office in its application for federal registration. Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co., 339 F.Supp. 973, 983 (M.D. Tenn. 1971), aff'd on other grounds, 470 F.2d 975 (6th Cir. 1972). We conclude therefore that there is no clear and convincing evidence, Skippy, Inc. v. CPC International, Inc., 210 U.S.P.Q. 589, 594 (E.D. Va. 1980), rev'd in part on other grounds, 674 F.2d 209 (4th Cir. 1982), that Modern Acceptance acted fraudulently.
 
 
 34
 We turn therefore to the issues raised by Harriscorp's cross-appeal from the district court's holdings that: (1) "THE MONEY STORE" is a suggestive rather than merely descriptive mark; (2) laches is inapplicable because Harriscorp did not act to its prejudice because of Modern Acceptance's delay in bringing suit; and (3) Harriscorp cannot assert the rights of a good faith junior user in this action because the assignment from United lacked any transfer of goodwill.
 
 III. DESCRIPTIVE VERSUS SUGGESTIVE
 
 35
 Trademarks are commonly evaluated on a spectrum ranging from (1) generic or common descriptive through (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful. Telemed Corp. v. Tel-Med, Inc., 588 F.2d 213, 216 (7th Cir. 1978). The distinction between a "merely descriptive" mark and one that is "suggestive" is critical because the former is not subject to registration, absent a finding of secondary meaning, 15 U.S.C. § 1052(e) (1976), whereas no such requirement pertains to a suggestive mark. As this court had previously noted, however, the "line between descriptive and suggestive marks is scarcely 'pikestaff plain.' " Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 379 (7th Cir. 1976), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94.
 
 
 36
 Because the Patent Office allowed the plaintiff to register the "THE MONEY STORE" without proof of distinctiveness or secondary meaning, it apparently believed that the mark was suggestive. This conclusion constitutes prima facie evidence that the mark is suggestive. Id. at 378.[7] The defendant's statement that this prima facie presumption of validity may be easily overcome, supported by cases in this court that were decided prior to Union Carbide, would appear to be less than a wholly accurate statement of the law. We note in particular that John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961), was clearly distinguished in Union Carbide, 531 F.2d at 378.
 
 
 37
 It is also the law of this circuit that a district court's finding regarding the descriptiveness or suggestiveness of a mark will be disturbed only if it is clearly erroneous. Telemed Corp. v. Tel-Med, Inc., 588 F.2d 213, 219 (7th Cir. 1978). Because the judge below found "THE MONEY STORE" to be a suggestive mark, the defendant carries a heavy burden in this court.
 
 
 38
 One of the better statements of the distinction between merely descriptive and suggestive marks appears in A. Seidel, S. Dalroff, and E. Gonda, Trademark Law and Practice § 4.06, at 77 (1963): "Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." (quoted in Union Carbide, 531 F.2d at 379); see also Tel-Med, 588 F.2d at 217 ("A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods.").
 
 
 39
 If we were considering the validity of "THE MONEY STORE" mark de novo, we would find this an extremely close case. On the one hand, "THE MONEY STORE" conveys the idea of a commercial establishment whose service involves supplying money. The term does not, however, necessarily convey the essence of the business, money lending. Arguably, the mark might refer to twenty-four hour teller services, or establishments which deal in foreign currency or traveller's checks, to mention just a few possibilities. Some imagination and perception are therefore required to identify the precise nature of the services offered by the plaintiff.
 
 
 40
 Although the district judge's evaluation as to where the mark falls on the continuum between "generic" and "arbitrary" was quite subjective, this determination is "often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation," Union Carbide, 531 F.2d at 379. We do not find that the degree of subjectivity inherent in the district judge's determination invalidates his finding. Further, we do not believe that Judge Grady confused the test for a "merely descriptive" mark with that applicable to the determination whether a mark is generic. The characterization issue in this case is a difficult one. We cannot say that the district judge's conclusion that "THE MONEY STORE" is a suggestive mark is clearly erroneous.
 
 IV. LACHES AND ESTOPPEL
 
 41
 A defense of laches or estoppel is cognizable only if there are showings both that the plaintiff delayed unreasonably in bringing suit and that the defendant acted to his detriment because of this delay. The defense will not lie upon a mere showing of delay, where no actual reliance is proven by the defendant. See Helene Curtis Industries, Inc. v. Church & Dwight Co., 560 F.2d 1325 (7th Cir. 1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978).
 
 
 42
 The judge below held that the twenty-two month delay between the meeting in New York, which ended in an impasse, and the filing of the instant suit was unreasonable. He denied relief to the defendant, however, because he found insufficient evidence that Harriscorp had acted in reliance on the plaintiff's silence.
 
 
 43
 We do not believe that the district court erred. Even if the plaintiff were precluded from obtaining a hearing on the merits of its infringement claim against Harriscorp until it began using the mark in the metropolitan Chicago area, see John R. Thompson Co. v. Holloway, 366 F.2d 108 (5th Cir. 1966); Dawn Donut Co. v. Hart's Foods Stores, Inc., 267 F.2d 358 (2d Cir. 1959), this is not justification for its total lack of communication with the defendant for twenty-two months.
 
 
 44
 On the other hand, the record demonstrates that the defendant began using the mark in the Chicago area, despite the plaintiff's pending federal registration, because it believed that the plaintiff's claim to national rights in the mark could not be upheld. There is absolutely no indication that the defendant's evaluation of this situation changed following the unsuccessful meeting in New York. We do not necessarily believe that the defendant's claim of reliance could succeed only if there were direct testimony as to specific actions taken by Harriscorp in reliance on the delay; rather, we hold that, considering the evidence as a whole in this case, we do not find the district judge's conclusion in error.
 
 V. ASSIGNMENT FROM UNITED
 
 45
 Harriscorp asserts the defense of a good faith junior user based on the January, 1974 assignment from United Bank. A good faith junior user is one who begins using a mark with no knowledge that someone else is already using it. The innocent junior user retains the right to use the mark in an area remote from where the senior user is operating. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916).
 
 
 46
 United began using the mark, "THE MONEY STORE," in the metropolitan Chicago area[8] in August, 1972, approximately eight months after the plaintiff's first use in New Jersey and Pennsylvania. United's use preceded issuance of the plaintiff's federal registration, however, by approximately twenty months. United could not be charged, therefore, with constructive knowledge of the plaintiff's use of "THE MONEY STORE" as a service mark. 15 U.S.C. § 1072 (1976); Burger King of Florida, Inc. v. Hoots, 403 F.2d 904 (7th Cir. 1968). Similarly, there is no evidence that United had actual knowledge of the usage of the mark by Modern Acceptance. United therefore was a good faith junior user. This status would give United, were it still using the mark, the right to enjoin the plaintiff's use of the identical mark in the Chicago area.
 
 
 47
 Whether Harriscorp can assert the good faith junior user defense turns on three factors: (1) whether United had abandoned use of the mark at the time of the assignment; (2) whether the assignment included a transfer of goodwill; and (3) whether the assignment is invalid as a sham transaction.
 
 
 48
 Before addressing these three points, we note that the fact Harris actually paid only one dollar to United is not dispositive. The exchange of a nominal sum, like the recitation that the assignment was for "good and valuable consideration," is customary in many contracts and does not in itself make the assignment ineffective. The amount actually paid is relevant only insofar as it might indicate either that United had abandoned the mark or that no goodwill was associated with "THE MONEY STORE" mark and therefore could not be transferred pursuant to the assignment. Each of these points is discussed below.
 
 
 49
 An abandoned trademark is not capable of assignment, see Avon Shoe Co. v. David Crystal, Inc., 171 F.Supp. 293 (S.D.N.Y. 1959), aff'd, 279 F.2d 607 (2d Cir. 1960), cert. denied, 364 U.S. 909, 81 S.Ct. 272, 5 L.Ed.2d 244, because such a mark is subject to cancellation by the Patent Office or by the courts and is therefore invalid. 15 U.S.C. §§ 1064(c), 1119 (1976). Section 45 of the Lanham Act defines when a mark shall be deemed abandoned. The subsection relevant to United's use of "THE MONEY STORE" mark states:
 
 
 50
 (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
 
 
 51
 15 U.S.C. § 1127 (1976). The district court found that United Bank was still using the mark at the time of the assignment and had not abandoned it. The plaintiff argues in its brief that "(a)bandonment is a matter of intent" and points to evidence suggesting that United intended to abandon use of the mark. The statutory definition makes clear, however, that abandonment requires discontinuance of use as well as intent to abandon. Such discontinuance of use was not found by the district court and we find nothing in the record suggesting that the court below was incorrect. United's use of the mark at the time of assignment is not analogous to the situation in Uncas Manufacturing Co. v. Clark & Coombs Co., 200 F.Supp. 831 (D.R.I. 1962), aff'd, 309 F.2d 818 (1st Cir.), on which the plaintiff relies. In Uncas, the district court found that the last sales of "BARODA" rings were sales of samples in April, 1956. The plaintiff claimed that the mark was used after that date because sales representatives retained samples showing the mark in their cases. The court held: "The fact that its sales representatives may have carried antiquated rings set with said imitation stones marked 'The BARODA Gem' in their sample cases after April 1956 does not establish that such mark was being used in commerce in such a way as to negate abandonment." Id. at 834. Although United's use of the mark may have declined by the date of the assignment, any use the Bank made of the mark was "in commerce" and therefore readily distinguishable from Uncas. We conclude that the judge below correctly found that United had not abandoned the mark at the time of the assignment to Harriscorp.
 
 
 52
 The assignment conferred no rights on Harriscorp under the Lanham Act, however, unless the goodwill of the business was assigned along with the mark. 15 U.S.C. § 1060 (1976). The judge below found that no goodwill had been transferred in the assignment. First, we recognize that, although the assignment stated that the mark was assigned "together with the good will of the business symbolized by the mark," such a recitation is not necessarily dispositive, e.g., Haymaker Sports, Inc. v. Turian, 581 F.2d 257 (C.C.P.A. 1978).
 
 
 53
 Second, we find that it is not necessary to the continuing validity of the mark that tangible assets of the assignor pass to the assignee. E.g., Glamorene Products Corp. v. Procter & Gamble Co., 538 F.2d 894, 895 (C.C.P.A. 1976); Sterling Brewers, Inc. v. Schenley Industries, Inc., 441 F.2d 675, 680 (C.C.P.A. 1971). The plaintiff contends that controlling weight should be given to whether there was a transfer of tangible assets. In support, he relies on three cases: Warner-Lambert Pharmaceutical Co. v. General Foods Corp., 164 U.S.P.Q. 532 (T.T.A.B. 1970); Mister Donut of America, Inc. v. Mr. Donut, Inc., 418 F.2d 838 (9th Cir. 1969); and Luckie Magic Corp. v. McCall Manufacturing Co., 133 U.S.P.Q. 487 (T.T.A.B. 1962). None of these cases is persuasive support for the plaintiff's contention. In Mister Donut, the court found that the assignor had not used the mark after disposing of his business in 1951. At the time of assignment, in 1956, therefore, there was no goodwill to be assigned. In Luckie Magic, there was a general purchase of assets. No reference was made to the assignment of any trademark or goodwill. The court's holding that there was no effective assignment is attributable to the absence of any such reference. Warner-Lambert Pharmaceutical Co. v. General Foods Corp., 164 U.S.P.Q. 532 (T.T.A.B. 1970), is distinguishable because the assignee used the mark in connection with an entirely different product from that manufactured by the assignor.
 
 
 54
 It is admittedly difficult to determine when a transfer of goodwill has occurred. This is particularly so in the case of a service mark. Before turning to other cases relied upon by the parties, it is important to recognize why the common law and Lanham Act prohibitions on a transfer of a mark unassociated with any goodwill exists:
 
 
 55
 A sale of a trademark divorced from its good will is characterized as an "assignment in gross." If one obtains a trademark through an assignment in gross, divorced from the good will of the assignor, the assignee obtains the symbol, but not the reality. Any subsequent use of the mark by the assignee will necessarily be in connection with a different business, a different good will and a different type of product. The continuity of the things symbolized by the mark is broken. Use of the mark by the assignee in connection with a different good will and different product would result in a fraud on the purchasing public, who reasonably assume that the mark signified the same things, whether used by one person or another.... The fundamental policy of consumer protection must always be kept in mind. The central purpose of the technical rules regarding the assignment of trademarks is to protect consumers and these rules were "not evolved for the purpose of invalidating all trademark assignments which do not satisfy a stereo-typed set of formalities." Syntex Laboratories v. Norwich Pharmacal Co., 315 F.Supp. 45 (S.D.N.Y. 1970), aff'd, 437 F.2d 566 (2d Cir. 1971).
 
 
 56
 McCarthy, Trademarks and Unfair Competition § 18.1, at 607.
 
 
 57
 Application of this reasoning is apparent in Pepsico, Inc. v. Grapette Co., 416 F.2d 285 (8th Cir. 1969). In that case, the mark "Peppy" had been used for many years on a cola-based drink. The mark was assigned to Grapette Co. Grapette acquired no tangible assets from the assignor, nor any process or formula for producing the beverage. Grapette then used the "Peppy" mark on a pepper-type beverage. The Pepsico court noted the possibility of public deceit if the assignment were considered valid, id. at 289, and stated:
 
 
 58
 It seems fundamental that either the defendant did not acquire any "goodwill" as required by law or if it did, assuming as defendant argues the mark itself possesses "goodwill," by use of the mark on a totally different product, Grapette intended to deceive the public. Either ground is untenable to the validity of the assignment.
 
 
 59
 Id. at 290.
 
 
 60
 Turning to the cases upon which the parties rely, the defendant cites Glamorene Products Corp. v. Procter & Gamble Co., 538 F.2d 894 (C.C.P.A. 1976). In that case, Stauffer assigned the mark "BOUNCE," which was used on a dry-cleaning detergent, to Procter & Gamble. The assignment included a recitation that it was together with the goodwill of the business. Stauffer retained the tangible assets of its business. Procter & Gamble used the mark on its own dry-cleaning detergent. The Glamorene court found the assignment valid.
 
 
 61
 The plaintiff argues that Glamorene was restricted by Haymakers Sports, Inc. v. Turian, 581 F.2d 257 (C.C.P.A. 1978). In Haymakers, the mark was pledged by Avon Shoe Company to its attorneys as collateral security for the attorneys' fees. Following further business decline, the mark was assigned to the attorneys the following year. A new agreement was then made, providing that if Avon ceased to do business and one or more stockholders of Avon continued payments to the attorneys, the stockholder(s) would receive the mark. Three years later, Avon ceased operations and defaulted on its obligation. Stockholder Turan paid off the debt to the attorneys and used the mark on shoes manufactured by his corporation or imported by him. The assignment was held ineffective. The court noted that the attorneys had never used the mark. Id. at 261. In footnote, the Haymakers court stated that Glamorene did not compel a contrary conclusion because in that case the assignees began using the mark "BOUNCE" immediately. Haymakers is a unique case because of the two assignments involved and the fact that the first assignment was to attorneys who had no relationship whatsoever to the shoe business. We believe that Haymakers is consistent with Glamorene, as the Haymakers court indicated, and does not restrict the earlier case.
 
 
 62
 Perhaps the strongest case in support of Harriscorp's contention is Hy-Cross Hatchery, Inc. v. Osborne, 303 F.2d 947 (C.C.P.A. 1962). In Hy-Cross, the assignor held a valid registration of the mark "HY-CROSS" and had used it for some time to identify the baby chicks that he sold. He assigned the mark, along with a recitation of goodwill. The assignor continued in the business of selling chicks. The court held that the assignment was effective, stating that "by assigning the goodwill, (the assignor) gave up the right to sell 'HY-CROSS' chicks. This had been a part of his 'business.' " Id. at 950.
 
 
 63
 Modern Acceptance argues that Hy-Cross is weak support because of then Judge Blackmun's concurrence in Pepsico, Inc. v. Grapette Co., 416 F.2d 285 (8th Cir. 1969). As discussed supra, the assignee in that case had used the mark on an entirely different type of beverage from that made by the assignor. The majority of the court had mentioned the Hy-Cross case, characterizing it as involving a naked assignment, but had decided the appeal on the ground that an assignment is valid only if the assignee's product has the same characteristics as that of the assignor. In his concurrence, Judge Blackmun noted that Hy-Cross was a peculiar case in that live baby chicks were the product of both the assignor and assignee. He read Hy-Cross as attaching little significance to the absence of any assignment of the chicks themselves only in that particular context. Judge Blackmun stated that he would be opposed to any broader interpretation of the Hy-Cross rule.
 
 
 64
 We do not believe that Judge Blackmun's concurrence casts doubt upon the applicability of Hy-Cross to the instant case. The circumstances in this case are also "peculiar" in that United and Harriscorp offered the identical service. A customer who was drawn first to United and later to Harriscorp because of the "MONEY STORE" mark would not be misled as to the nature of the services offered. United's use of the mark in advertising, including highly visible billboards, strongly suggests that the mark carried with it a degree of goodwill. What United gave up in assigning the mark was the right to attract customers through use of the mark. The fact that one cannot say with certainty how many customers might have gone to a Harriscorp office, rather than a United office, because they recognized the mark does not compel the conclusion that no goodwill passed with the assignment.
 
 
 65
 The cases cited by both sides of this controversy are consistent with the underlying purpose of why a transfer of goodwill is required in order for an assignment of a mark to be effective. The cases all seek to protect customers from deception and confusion. In the case of a service mark, such confusion would result if an assignee offered a service different from that offered by the assignor of the mark. Such is not the case here.
 
 
 66
 We similarly do not believe that there was a lack of continuity in the usage of the mark. The mark was utilized by Harris Bank in the short period between the assignment and the opening of the Harriscorp offices. It was used both before and after the assignment in connection with money-lending services.
 
 
 67
 One final point remains. The plaintiff claims that the assignment is ineffective because it was a sham transaction, initiated by Harris for the sole purpose of obtaining superior rights to the mark in the Chicago area. Presumably, Harris sought the assignment because it knew of the plaintiff's prior rights in the mark. Harris did in fact know of the plaintiff's pending registration and it would be naive to conclude that that knowledge was completely irrelevant to its decision to seek an assignment from United. It is also true, however, that so long as United retained any rights in the mark, that institution was itself an impediment to the defendant's usage of the mark. Obtaining the assignment from United is consistent with the defendant's documented belief that the plaintiff could not successfully assert nationwide rights in the mark, and therefore another institution was free to use the mark in the Chicago area. We do not believe that an assignment motivated at least in part by sound business judgment should be set aside as a sham transaction.
 
 
 68
 We conclude that the assignment from United to Harris was effective. The mark had not been abandoned at the time of the assignment and whatever goodwill was associated with the mark passed to the defendant pursuant to the assignment.
 
 VI. ATTORNEYS' FEES
 
 69
 Finally, we address whether the district judge erred in awarding attorneys' fees to the defendant pursuant to section 38 of the Act, 15 U.S.C. § 1120 (1976). That section provides:
 
 
 70
 Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.
 
 
 71
 This court has previously clarified that a "mistake" in statements made to the Patent Office is insufficient to support an award of damages pursuant to section 38. Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co., 381 F.2d 879, 884 (7th Cir. 1967), cert. denied, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968); accord, Loctite Corp. v. National Starch & Chemical Corp., 516 F.Supp. 190 (LBS) (S.D.N.Y. 1981); Acme Valve & Fittings Co. v. Wayne, 386 F.Supp. 1162, 1169 (S.D. Tex. 1974); De Mert & Dougherty, Inc. v. Chesebrough-Pond's, Inc., 348 F.Supp. 1194, 1199 (N.D. Ill. 1972); Schwinn Bicycle v. Murray Ohio Manufacturing Co., 339 F.Supp. 973, 984 (M.D. Tenn. 1971), aff'd on other grounds, 470 F.2d 975 (6th Cir. 1972). In Duncan, the plaintiff had expressed concern that the term "yo-yo" might be found descriptive prior to his application for registration. This court held that:
 
 
 72
 (N)o fraudulent or false statements were made and that no fraud was involved in connection with the procurement of Duncan's trademark registrations.... (T) he evidence falls short of showing that Duncan's claims to the trademarks were knowingly made in bad faith, or that his applications were punctuated with false or fraudulent statements.
 
 
 73
 381 F.2d at 884. The defendant's counterclaim in Duncan, based on 15 U.S.C. § 1120 (1976), was held to have been properly dismissed.
 
 
 74
 Having found that Modern Acceptance did not act fraudulently in obtaining registration of the mark "THE MONEY STORE," we conclude that no damages should have been awarded in this case. We express no opinion as to whether attorneys' fees constitute a proper measure of damages pursuant to section 38. Because of our finding that no damages should have been awarded, we do not address further the defendant's argument that the district judge erred in awarding less than the full amount claimed.
 
 CONCLUSION
 
 75
 Having considered all the arguments urged by both parties to this suit, we conclude that Modern Acceptance did not act fraudulently in obtaining registration of the mark, "THE MONEY STORE." Harriscorp is entitled, however, to assert the rights of a good faith junior user in its market area, as that area shall be determined by the district court on remand. The judgment of the district court is vacated and the case is remanded for proceedings consistent with this opinion. Circuit Rule 18 shall not be applicable on remand. Each party shall bear its own costs.
 
 
 
 *
 James L. Foreman, Chief Judge of the Southern District of Illinois, is sitting by designation
 
 
 [1]
 The terms "trademark," "servicemark," and "mark" are used interchangeably throughout this opinion to refer to "THE MONEY STORE" as used by both the plaintiff and defendant in this action
 
 
 [2]
 For purposes of clarity, we refer to the plaintiff-appellant-cross-appellee as Modern Acceptance hereafter in this opinion
 
 
 [3]
 For purposes of discussing the rights of these state-registered users hereafter in this opinion, we will refer only to Peoples, the registered user in Utah of the identical mark for similar services
 
 
 [4]
 "Interference" is found when the Commissioner determines that the mark for which registration is sought is so similar to a previously registered mark or a mark for which application for registration has been made as to cause confusion, mistake, or deception. Id. § 1066. The reference in section 17 to "interference" is therefore irrelevant to the instant case
 
 
 [5]
 We note that nothing in the record suggests that if Modern Acceptance had investigated further, it would have learned more about Kaufman's usage than it knew following the coincidental phone conversation between Costa and a Kaufman representative
 
 
 [6]
 We do not believe that Modern Acceptance would have acted fraudulently even if it had signed the oath knowing all the facts of Peoples' use of the mark as presented at trial in the present case. To summarize those facts, Peoples' advertising arguably extended across state lines and it had some dealings with customers who had moved to other states. The company, however, structured its dealings with care so as to remain outside the definition of "interstate commerce" as applied by the Securities and Exchange Commission
 
 
 [7]
 The defendant suggests that the presumption is inapplicable in this case because the relevant evidence of descriptiveness was not before the Patent Office at the time of registration. The defendant is not specific as to which evidence it feels was not considered at the time of registration. We do not feel compelled to resolve this precise issue, however, because this evidence was before the district court who also found the mark to be suggestive. As indicated infra, our review of the district court's finding is limited by the "clearly erroneous" standard
 
 
 [8]
 The evidence indicated that United used the mark in Cook County, Illinois and the surrounding counties: Lake County, McHenry County, Will County, DuPage County, and Kane County