Vol II  F47

FOR PUBLICATION IN FULL

Paper No. 25
S. Despertt

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

Heaton Enterprises of Nevada, Inc.,
substituted for Midwest Pizza
Ventures, Inc.
v.
Samuel E. Lang, Trustee under the
Harold Minsky Family Trust

———

Cancellation No. 15,304

———

G. Brian Pingel and Kent A. Herink for Heaton Enterprises of
Nevada, Inc.

Robert D. Hovey and Schmidt, Johnson, Hovey & Williams for Samuel
E. Lang, Trustee under the Harold Minsky Family Trust

———

Before Rooney, Simms and Hanak, Members.

Opinion by Rooney, Member:

A petition has been filed by Heaton Enterprises of Nevada,
Inc.[1] to cancel the registration of the mark **MINSKY'S**, issued
pursuant to Section 2(f) of the Act, for restaurant services.[2]
The grounds for cancellation are that registrant is not entitled
to the exclusive use of the mark and hence is not entitled to
registration thereof; that petitioner is the owner and operator of
the original **MINSKY'S** pizza restaurant and by way of assignment is

---

[1] Substituted for Midwest Pizza Ventures, Inc.

[2] Registration No. 1,341,636 issued June 11, 1985 to Samuel E.
Lang, Trustee under the Harold Minsky Family Trust. Use as of
March 6, 1976 is claimed.

the owner of the names and marks used in connection therewith (**MINSKY'S, MINSKY'S PIZZA** and **MINSKY'S PIZZA JOYNT**) subject to the nonexclusive right of James Heaton to establish a single restaurant under the name **MINSKY'S** outside the state of Iowa; and that the registered mark as used on the recited services is so similar to petitioner's mark as used on its services as to be likely to cause confusion, mistake or deception. It is further alleged that registrant obtained its registration fraudulently by swearing under oath that he believed himself to be the owner of the mark sought to be registered and that no other person had the right to use said mark in commerce, despite having full knowledge of petitioner's prior use, and by claiming use in connection with restaurant services when he had never made such use.

The record on behalf of petitioner consists of the registration file, registrant's answers to petitioner's Interrogatories Nos. 1, 13, 17, 18, 19, 20, 27 and 29 and one exhibit provided in connection with Interrogatory No. 1(f) (which is a copy of the license agreement between registrant and Minsky's on Main) filed by petitioner under a notice of reliance; and the testimony deposition of Kevin Heaton (hereinafter Kevin), petitioner's president; on respondent's behalf, status and title copies of four registrations owned by registrant[3], the file of

---

[3] Registration No. 956,287, **MINSKY'S**; Registration No. 956,288, **MINSKY'S BURLESQUE**; Registration No. 956,289, **MINSKY'S FOLLIES**; and Registration No. 956,290, **MINSKY'S BURLESQUE FOLLIES**. All four registrations issued on March 27, 1973 and identify the services as production and staging of musical revues, including burlesque shows; Section 8 affidavits have been accepted and Section 15 affidavits filed in each. The words "burlesque" and "follies" are disclaimed where they appear.

the trademark application filed by Midwest Pizza Ventures, Inc.[4], registrant's responses to petitioner's first and second sets of interrogatories[5], copies of pages from selected issues

---

[4] Ser. No. 475,670 filed April 16, 1984 for **MINSKY'S PIZZA** for restaurant services, seeking a concurrent use registration for the United States with the exception of the states of Kansas, Colorado, Missouri and Florida. The applicant named Minsky's On Main, Kansas City, Missouri, as the exception to applicant's right to exclusive use.

[5] Registrant offered its responses to petitioner's interrogatories "pursuant to Rule 2.120(j)(3) (4) and (5) inasmuch as fewer than all of Registrant's answers to Petitioner's interrogatories were offered into evidence by Petitioner ... and the remaining interrogatory answers and ... exhibits ... should in fairness be considered so as to make not misleading what was offered by Petitioner and as permitted by Rule 2.120(j)(5)". The "fairness provision" of Rule 2.120(j)(5) was not intended to permit the blanket filing of any interrogatory answers by the answering party which had not been introduced by the propounding party. Rather, it is the purpose of this provision to allow an answering party to avoid an unfair interpretation of responses relied on by the propounding party which contain less than all of the relevant information. Thus, the answering party may offer whichever of the remaining answers tend to present a truer picture. In such cases, the answering party is expected to select only the relevant answer and to inform the Board of the relationship of that answer to one or more of those offered by the propounding party. It is not enough to notice reliance on the remaining answers as registrant has done and expect the Board to determine which of the previously filed answers need clarification and decide which of the remaining answers, in fact, clarify or explain those answers. However, having said that, we note that, although petitioner filed a motion to strike portions of registrant's notice of reliance, there was no mention of registrant's reliance on the remaining discovery answers. It therefore appears that petitioner has waived that objection and to the extent that any of the answers submitted by registrant are clearly and unequivocally explanatory or clarifying, we have considered them. See Holiday Inns, Inc. v. Monolith Enterprises, 212 USPQ 949 (TTAB 1981) and the Board of Trustees of the University of Alabama v. BAMA-Werke Curt Baumann, 231 USPQ 408 (TTAB 1986).

of the Southwestern Bell Telephone Directory for Greater Kansas City, copies of a number of articles from certain printed publications[6] and a copy of a book entitled "Minsky's Burlesque," all noticed by respondent. There was no oral hearing held on this matter and only petitioner filed a brief.

The marks involved herein are virtually identical and are used for the same services. There is no question that a likelihood of confusion exists between them. The only issues to be decided are which of these parties has superior rights in the mark MINSKY'S and whether or not registrant's registration was obtained fraudulently.

The history of the use of the MINSKY marks on restaurant services is somewhat tortuous and it may be easier to discuss by geographical area.

To begin with, in August 1975, Gregg Johnson (hereinafter Johnson), who may be characterized as the predecessor to both parties in the pizza business, opened a restaurant at 118 Hayward Avenue in Ames, Iowa under the corporate name Minsky's Pizza Joynt, Inc. Early in 1976, he opened a second MINSKY'S restaurant in Ames at 328 Main Street. In March of the same year, Minsky's Pizza Joynt, Inc. (Gregg Johnson, president) sold its businesses

---

[6] Eight additional documents were stricken with leave to registrant to supplement the notice of reliance to correct the deficiencies noted with respect to three of them. However, since registrant declined the opportunity to do so, all eight remain stricken from the record.

4

to James Heaton (hereinafter James) and Harold Weinstein (hereinafter Weinstein), who incorporated as W-H, Inc. (sometimes referred to as W & H, Inc.). The purchase agreement stated that it included the "good will and the trade names 'Minsky's' or 'Minsky's Pizza Joynt' or any derivative thereof".[7] Johnson then moved to Kansas City where he opened a pizza restaurant under the name **MINSKY'S** in the summer of 1976. James' son, Curtis Heaton (Curtis), who worked in the Ames store when it was owned by Johnson and, in accordance with the contract of sale for that property, was employed there by his father until June 1976, left thereafter and went to Kansas City to work with Johnson in his restaurant there. His brother, Kevin, also worked in the Ames store for his father until 1980 when he, too, went to work at **MINSKY'S** in Kansas City. (Kevin deposition, p. 22).

Meanwhile, back in Iowa, W-H, Inc. (James and Weinstein) opened a third **MINSKY'S** in Council Bluffs in the Fall of 1978. On March 1, 1979, Weinstein purchased the Council Bluffs store from W-H, Inc. Under the contract of sale for the Council Bluffs restaurant, Weinstein was given the "right to use the trade names 'Minsky's' or 'Minsky's Pizza Joynt' and the right to use

---

[7] Registrant's attorney attempted to establish through the cross-examination of Kevin that the contract restricted the buyers' activities to the state of Iowa. However, that restriction was stated in the contract to last only until the final payment of the purchase price, which appears to have been due in November 1979, at which time an assignment was to have been made to pass title to the buyers. The assignment is of record (Exhibit C attached to the purchase agreement).

the pizza recipe owned by Seller" and it was specifically stated that "Buyer does not hereby acquire any ownership, title or proprietary rights to the trade names, 'MINSKY'S or 'MINSKY'S PIZZA JOYNT' or any derivative thereof". The right to use the name was further restricted to the location at 201 West Broadway, Council Bluffs. (Petitioner's Exhibit 2). On September 13, 1979, Weinstein sold all of his stock in W-H to James including the rights to the names and marks reserving only a right to use said names and marks in connection with the Council Bluffs restaurant.

In 1980, James and his son Curtis opened a **MINSKY'S** pizza restaurant in Austin, Texas, an undertaking which lasted almost a year.[8] (Kevin testimony, p. 24).

James formed a second corporation, Heaton Enterprises, Inc., which opened yet another **MINSKY'S** in Iowa in 1981, this one in Nevada, Iowa. Also in 1981, the two earliest restaurants changed location; the Hayward St. store moved to 414 Lincoln Way and the Main St. store to 2514 Chamberlain, both in Ames.

Exhibit 5 to the Kevin Heaton deposition is a purchase and sale agreement dated August 31, 1983 between James, as an individual, and Midwest Pizza Ventures, Inc. (Midwest), a corporation formed by the Heaton brothers, Kevin and Curtis. By this agreement Midwest purchased from James all of the stock of Heaton Enterprises, Inc. and so acquired, according to the

---

[8] There are no details concerning the restaurant in Austin, Texas. We know only that it opened and survived briefly.

6

contract, the restaurant at 414 Lincoln Way, Ames, Iowa, identified as an asset of said corporation.[9] The contract also stated that James retained the restaurant at 2514 Chamberlain St., Ames, Iowa and, according to the contract, the one in Nevada, Iowa.[10] As to the name MINSKY'S and its derivatives, it was specifically stated in paragraph 8, page 4 that

> ... Purchaser shall not have the exclusive right or claim to the trade name 'Minsky's Pizza' or any derivation or modification thereof, or any trademark associated therewith. Purchaser further acknowledges that pizza-oriented restaurants are being operated in the following locations under the name 'Minsky's Pizza' or similar names: 605 Lincoln Way, Nevada, Iowa, by Heaton Enterprises of Nevada, Iowa, Ltd.[11]; 2514 Chamberlain Street, Ames, Iowa by W & H, Inc.; Council Bluffs, Iowa, by a corporation, partnership, or sole proprietorship involving one Harold Weinstein; and various other Minsky Pizza restaurants in the States of Kansas, Colorado, Missouri and Florida.

---

[9] Kevin testified that at the time of this transaction Heaton Enterprises, Inc. owned both restaurants in Ames, Iowa and the one in Nevada, Iowa. He also testified that Heaton Enterprises was a separate corporation from W-H, Inc. However, there is neither testimony nor documentation to explain how Heaton Enterprises, Inc. acquired the two Ames restaurants which had been, up to this point, owned by W-H, Inc. (Kevin Heaton testimony deposition, p. 26).

[10] However, see footnote 11.

[11] This is yet another corporation in the scenario (formed by Kevin on his own). To minimize the confusion engendered by these transactions we have to get a little ahead of the story and explain that Heaton Enterprises of Nevada, Iowa, Ltd. (by change of name now Heaton Enterprises of Nevada, Inc., petitioner) purchased the Nevada restaurant from Heaton Enterprises, Inc. (James) by a contract of September 30, 1983 with an effective date of April 1, 1983.

The seller, James, also retained the "non-exclusive right to use the trade name 'Minsky's Pizza' ... "in connection with the operation of one restaurant outside of the state of Iowa. According to Kevin's testimony, that restaurant was to be opened in Arizona but apparently has not yet been. One further provision of the contract stated that "... should a Purchase Agreement be entered by and between W & H, Inc. ... for the sale of the pizza restaurant at 2514 Chamberlain Street..."[12] it was not to include any right to the name **MINSKY'S PIZZA** and, until that restaurant should be sold, James could operate it under the name **MINSKY'S PIZZA.**

Things get more confusing from this point because several transactions which occurred were made retroactively effective. The first of these, mentioned in footnote 11, was the sale on September 30, 1983 (with an effective date of April 1, 1983) of the Nevada, Iowa restaurant from Heaton Enterprises, Inc. to Heaton Enterprises of Nevada, Inc. In paragraph 5 of the sale agreement, it is provided that

> ... Purchaser shall not have the
> exclusive right or claim to the trade
> name 'Minsky's Pizza', or any derivation
> or modification thereof ... Purchaser
> further acknowledges that pizza-oriented
> restaurants are being operated in the

---

[12] This is inconsistent with Kevin's testimony in connection with Exhibit 5, stating that at the time of the sale to Midwest, Heaton Enterprises owned both of the Ames restaurants. However, the one consistency throughout these transactions is a rather careless regard for the details of ownership.

following locations under the name 'Minsky's Pizza' or similar names: Council Bluffs, Iowa by a corporation, partnership, or sole proprietorship involving one Harold Weinstein; and various other Minsky's Pizza restaurants in the states of Kansas, Colorado, Missouri and Florida.

Next was an "assignment" dated October 15, 1984 (stated to be effective as of August 31, 1983), executed by James, individually, and as president of both Heaton Enterprises, Inc. and W-H Inc. in favor of Midwest Pizza Ventures, Inc. (Curtis and Kevin) assigning all right, title and interest in and to the trade name and trademark **MINSKY'S PIZZA** and any derivation thereof with the goodwill associated therewith, with the exception of the "nonexclusive right of James Heaton to use the name in connection with the operation of one restaurant outside the state of Iowa."

There were two final transactions in Iowa which are rather circuitous. On February 18, 1986, a purchase and sale agreement was made whereby Kevin and Curtis were to sell to James all of the stock of Midwest Pizza Ventures, Inc. and all of the assets previously acquired from Heaton Enterprises, Inc. and all assets of the sellers except as otherwise indicated.

Paragraph 3 of that agreement excludes "the rights to the trademark and trade name 'Minsky's Pizza' and an application for federal registration of same except insofar as those rights are partially conveyed in Section 6...." Section 6 reads:

> Sellers hereby grant to Purchaser the exclusive right to use the trademark and trade name 'Minsky's Pizza' in the States of Arizona and Iowa, except for the City of Nevada, Iowa.

9

In a covenant not to compete, the sellers restricted their activities in the pizza business so as to exclude the states of Arizona and Iowa except for Nevada, Iowa.

This agreement was signed by James, and by Kevin as an individual, as president of Midwest Pizza Ventures, Inc. and as president of Heaton Enterprises of Nevada, Iowa, Ltd. According to the testimony of Kevin, having been signed by the aforementioned parties, the agreement was held by Kevin and was assertedly signed by Curtis at some later date.[13] During the interim between the execution by James and Kevin and the subsequent signing by Curtis, another separate assignment was made.

The latter, executed on February 20, 1986, was retroactive to February 17, 1986 (one day prior to the last-mentioned transaction). By this final (as far as we know) document, Midwest Pizza Ventures, Inc. assigned all of its right, title and interest in and to the name and mark **MINSKY'S PIZZA** along with the goodwill associated therewith, including all rights to application for trademark registration Serial No. 475,670 filed April 16, 1984[14] and the right to proceed with the instant cancellation petition, to Heaton Enterprises of Nevada, Inc. with the exclusion

---

[13] Kevin testified that "Curtis signed his in the mail from Kansas City." The copy of record was not signed by Curtis.

[14] On April 16, 1984, Midwest Pizza Ventures, Inc. had filed an application for a concurrent use registration. See footnote 4.

of Midwest's rights "in such name and mark for the State of Arizona[15] and the State of Iowa (other than the City of Nevada, Iowa)."

The story outside of Iowa is not as complex. When Johnson left Iowa following the sale of the **MINSKY'S PIZZA** restaurant to James, he apparently opened a restaurant and began doing business in Kansas City as **MINSKY'S ON MAIN**. (See Interrogatory Answer No. 19). Soon afterward, Curtis, who had worked for Johnson in Iowa, went to Kansas City to manage Johnson's restaurant. (Kevin deposition pp. 14 & 15). Kevin followed a few years later.

On December 30, 1983, Minsky's On Main, Inc. became a licensee of Samuel E. Lang, as Trustee, under the Harold Minsky Family Trust Agreement (Lang) for use of the **MINSKY** mark. The application which matured into the registration herein sought to be cancelled was subsequently filed by Lang on March 9, 1984. Minsky's On Main currently renders restaurant services under the licensed mark **MINSKY'S** in Kansas and Missouri.

Turning first to the question of which of these parties has superior rights to this mark, it is noted that trademarks or

---

[15] This is one more inconsistency since, in every transaction involving, inter alia, the rights of James to the mark, he reserved the right to the mark for a single restaurant outside of Iowa (later identified as Arizona in succeeding documents and in Kevin's testimony). In this last document, the right to a restaurant in Arizona is reserved to Midwest and there is nothing of record to show how Midwest succeeded to that right (such as it is).

11

service marks can be assigned from one entity to another, which is an "outright sale of all rights in that mark," or may be licensed to others, which allows one entity to retain ownership of the mark while permitting another separate entity to use the mark subject to control of the first. See J. Thomas McCarthy, Trademarks and Unfair Competition, 2nd ed., §18:1. In a licensing situation, both the licensor and the licensee may be using the mark during the term of the license.

Although the transactions which occurred between James and the subsequent users who claim rights through him were stated to be sales involving the assignment of rights in the name MINSKY'S, in none of them did James ever relinquish all rights to the name.[16] We conclude therefore that what James sought to do was to license the use of the name while retaining ownership thereof in himself. However, none of the contracts contained any provisions for quality control of the services to be performed. Nor is there anything in the record from which it may be

---

[16] An assignment may be valid even in cases where the assignor reserves some rights of use of the mark. This can happen where there is an assignment of the mark with the good will of the business followed by a license back to the assignor. See Trademarks and Unfair Competition, supra, § 18.1(I) This was not done in this case.

12

determined that quality control was, in fact, being exercised.[17] It is concluded therefore that the "assignments" of rights to the mark as set forth in the aforementioned documents were neither assignments nor valid licensing agreements.

It is well settled that uncontrolled licensing of a mark by the owner thereof results in abandonment of that mark because allowing other parties to use the mark, without inspection and supervision to assure the maintenance of the quality which the name has come to represent, causes that name to lose its significance as a mark. See Haymaker Sports, Inc. v. Turian, 198 USPQ 610 (CCPA 1978) and Yocum v. Covington, 216 USPQ 210 (TTAB 1982). Nor does it matter that, with the exception of Weinstein, the various entities involved in the Iowa restaurants were formed by members of the same family. Each of the corporations was a separate legal entity.[18]

Considering the situation in this case in light of the foregoing statements, we see that from March 1976 to September 1979 there were three restaurants operating under the **MINSKY'S**

---

[17] There was a clause in the contract between James & Weinstein with reference to the Council Bluffs restaurant through which James was employed for six months as a consultant to Weinstein in the operation of the Council Bluffs restaurant for the sum of $10,000. This in no way can be interpreted as control of the nature and quality of the goods by a licensor.

[18] This comment is prompted by the fact that the attorney for petitioner, in correspondence with registrant's attorney, refers repeatedly to "the Heatons" as if their interests were at all times one and the same.

13

mark in Iowa owned by a single entity, W-H, Inc. In 1979, two were owned by W-H, Inc. and a third by Harold Weinstein.[19] Weinstein was permitted to use the mark but had no ownership rights to it. In 1980, there were two **MINSKY'S** restaurants in Iowa owned by one entity, a third in Iowa owned by a second entity and one in Texas owned by still a third, all ostensibly claiming the right to use the name through James. In 1981, an additional user of the name in Iowa, Heaton Enterprises, Inc. appeared on the scene. Presuming that the Austin, Texas restaurant was closed by this time, there were still three separate parties who had been afforded use rights in the mark by James. Still more users appear in 1983 with the sale to Midwest Pizza Ventures of the restaurant at 414 Lincoln Way, Ames, Iowa and the Nevada business to Heaton Enterprises of Nevada. By the end of 1983 we see that James through W-H, Inc. still has the Chamberlain facility, Harold has Council Bluffs, Kevin through Heaton Enterprises of Nevada has Nevada, Kevin and Curtis, as Midwest Pizza Ventures, have Lincoln Way in Ames, and let us not forget that James also has the right to open a single **MINSKY'S** pizza business outside of Iowa.

For a time beginning in 1983, by way of a retroactive "assignment," Midwest Pizza Ventures attained "all right, title and interest," to the **MINSKY** name in connection with pizza

---

[19] There is testimony that the Council Bluffs restaurant closed in 1982 or 1983. The witness was uncertain. But, it appears that the Council Bluffs restaurant was operated by Harold Weinstein from March 1, 1979 until at least September 30, 1983. (See Petitioner's Exhibit 5, paragraph 5).

restaurants except that James still had the right to open one restaurant outside Iowa (and incidentally also owned the Nevada restaurant, which apparently was being run by, but not yet sold to, Kevin). This last little detail was taken care of by yet another retroactive document dated September 30, 1983, said to be effective on April 1, 1983, by which James (as Heaton Enterprises, Inc.) sold the Nevada restaurant to Kevin. Thus, in September 1983, even though James had, on paper, transferred "all rights" in the MINSKY name to Midwest, there were still at least three separate entities claiming a right to use the name through him and he continued to claim some rights in himself as well.

The final set of transactions seems to have been motivated by the filing of this petition in late 1985 by Midwest Pizza Ventures. The purchase and sale agreement of February 18, 1986 by which Kevin and Curtis sought to transfer all of their interests in Midwest and in Heaton Enterprises (the latter recently acquired from James) back to James (Exhibit 7) was not complete when they apparently reevaluated the situation and decided instead to transfer everything they had retroactively to Heaton Enterprises of Nevada (Exhibit 8), which also owned the Nevada operation. Thus, it appears that the February 18, 1986 transfer to James would have been void if, and when, Curtis ever did sign the document.

If the intent of the final assignment was to complete the chain of title to Heaton Enterprises of Nevada (which was subsequently substituted as petitioner herein), it is clear that

15

this document failed to accomplish that purpose because, among the other defects in that chain, it specifically excluded from the transfer the right of Midwest Pizza Ventures in the name and mark for the states of Arizona and Iowa (other than Nevada, Iowa).[20]

Registrant is entitled to the prima facie presumption that its registration is valid, that the registrant is the owner thereof and has the exclusive right to use of the mark. (Section 7(b), Trademark Act of 1946). It is the burden of a petitioner seeking to cancel a registration under Section 2(d) to prove that it has a superior right to a mark the same as or similar to the registrant's which is being used on the same or similar goods or services. Petitioner has failed to sustain that burden.

By his apparent acquiescense to Johnson's use of the mark in Kansas City and his uncontrolled licensing of the mark, beginning with Weinstein in 1979, James effectively abandoned any rights he may have had in the **MINSKY'S** mark. Those who subsequently were given the right to use the mark by James could obtain no greater rights than were his to give. See Electro-Coatings, Inc. v. Precision National Corporation, 204 USPQ 410 (TTAB 1979). By the time the transactions involving petitioner occurred, James had divested himself of any exclusive rights which he, or any of his successors, could transfer to petitioner. Petitioner and its predecessors, including James, had no more than (as stated in several of the documents of sale) a nonexclusive

---

[20] As previously noted, it is not clear how Midwest acquired that right. See footnote 15, page 10.

right to use the name with the acknowledgment that a number of specified others were also using the name, and presumably had a right to do so.

It is clear from the pleadings that petitioner is relying on rights which it claims to have acquired by way of "assignment" and that it acknowledges, even now, that those rights are "subject to the nonexclusive right of James Heaton to establish a single restaurant under the name 'Minsky's' outside the state of Iowa". Since we have determined that James abandoned any rights he may have had in the mark, it is also clear that petitioner, insofar as it claims its rights through James, cannot be the possessor of the superior right necessary to successfully challenge respondent's registration under Section 2(d) of the Statute.

Apart from the foregoing, it is noted that there seems to have been some attempt by the Heaton brothers and father to improve the situation by centralizing the scattered forces into one entity, first Midwest, then the aborted return to James and finally the transfer to Heaton Enterprises of Nevada. Even if this had rendered the latter the exclusive claimant in Iowa (which it did not) so that it might seek to rely on its own use, rather than any rights from James, the transaction through which petitioner hoped to accomplish that result occurred in February 1986, long subsequent to the license agreement between Lang and Minsky's On Main.

With respect to the licensee's rights, it appears that there was never any protest by James of Johnson's (respondent's licensee's) use in Kansas City[21] and the parties who have herein sought to challenge the registration, first Midwest and then Heaton of Nevada, were organized by Kevin and Curtis, both of whom worked for Johnson in the restaurant in Kansas City. Moreover, the corporation which they jointly formed, Midwest Pizza Ventures, Inc., sought a concurrent use registration with Minsky's On Main, the corporation through which Johnson operated, indicating that they did not at that time assert any claim of superior rights to the mark in question. As aforenoted, the transfer from Midwest to the substituted petitioner, Heaton Enterprises of Nevada could not perfect the defects in a title which had previously been invalidated through uncontrolled licensing. Thus, there has been no claim against the licensee's rights by any party which has a superior right to use the mark for restaurant services.

Turning to the fraud issue, petitioner pleaded that registrant committed fraud on the Office when it claimed to be the owner of the mark and that "no other person, firm, corporation or association has the right to use said mark in commerce", despite its knowledge of petitioner's prior use of its names and marks;

---

[21] Kevin testified that his father had been upset by Johnson's action, a statement objected to, and rightly so, as hearsay. Kevin also stated that no action had ever been taken by James in connection therewith. Therefore, as far as this record shows, James never objected to Johnson's opening of a MINSKY'S restaurant in Kansas City.

18

and in claiming trademark use in connection with restaurant services when it has never actually made use of the mark for restaurant services. [22]

We note that petitioner's interrogatories a) asked whether registrant was aware of restaurants operating in Iowa under the name **MINSKY'S** prior to March 9, 1984 (registrant's filing date), or prior to March 6, 1976 (registrant's claimed use date) and b) asked that information be provided regarding that knowledge. In response, registrant admitted that it was aware of the operations on both dates but said that these operations were considered an infringement of registrant's prior rights to the mark **MINSKY'S** and that the parties in Iowa had been given notice of infringement. (Petitioner's Exhibits 12A-F are copies of letters relative to a discussion of infringement exchanged by attorneys for the parties.) [23]  It is well settled that in order to prove that a party obtained its registration fraudulently, the party charging

---

[22] In its brief, petitioner further charges fraud in connection with an assertion of a claim under Section 2(f) of the Trademark Act. However, since this allegation was neither pleaded nor tried, we have not considered it.

[23] It appears that registrant, based on a claim of use of the mark **MINSKY'S** since the early 1900s for entertainment services (see Petitioner's Exhibit 12A), convinced Minsky's On Main to enter a license agreement with respect to the name. Since there is no evidence of record, with regard thereto, we do not know what entered into the negotiations between registrant and Minsky's On Main. Nor do we need to comment on whether the entertainment services performed by registrant under its registered mark (the record contains evidence of registrant's use for these services) are related to restaurant services. Minsky's On Main was apparently convinced that it was in its best interest to become a licensee of the mark and as stated in the license agreement "Licensee admits and acknowledges the value of the publicity and good will associated with the Trademark of the Licensor...."

19

fraud must establish that the acts said to be fraudulent were made in bad faith with a fraudulent purpose and an intent to secure a registration by deception.  See W. D. Byron & Sons Inc. v. Stein Bros. Mfg. Co., 153 USPQ 749 (CCPA 1967).

Where, as in this case, the affiant believed and was claiming that it had a right to the mark superior to that of other parties who might be using it, fraud is not shown by proof that registrant was aware of those other uses.  Cf. Allen Homes, Inc. v. 184 USPQ 705 (8th Cir. 1975).

Finally, petitioner's argument that registrant had no right to claim use in connection with restaurant services when it had never so used the mark is without merit.  For purposes of registration, a party may claim use through a related company (which includes a licensed company) provided the party relying on such use controls the nature and quality of the goods or services in connection with which the mark is used.  See Sections 5 and 45 of the Trademark Act of 1946 and Trademarks and Unfair Competition, supra, §18:16.  Moreover, "... rights to a mark may be acquired and maintained through  the use of that mark by a controlled licensee even when the only use of the mark has been, and is being made by the licensee."  See Pneutek, Inc. v. Scherr, 211 USPQ 824 (TTAB 1981).  For purposes of registration, it is necessary only that the use precede the filing of the application.

20

The license agreement was executed in December 1983.[24]  The application was filed March 9, 1984.  Thus, registrant had satisfied the requirement for filing its application.

**Decision:**  In view of the foregoing, the petition to cancel is dismissed.

L. E. Rooney

R. L. Simms

E. W. Hanak
Members, Trademark
Trial and Appeal Board

JUL 2 1 1988

---

[24]Although Johnson had used the mark for a number of years prior to the license, registrant cannot claim Johnson's earlier use.  As far as this record shows, this was not a case of an assignment with a license back.  A licensor must control the nature and quality of the goods or services for which the mark is licensed. The earliest that Lang could have done that was the date on which the license agreement was signed.  It is suggested that, should respondent be ultimately successful in retaining its registration, it file an amendment to the use date shown in the registration.