Hearing:                                        Paper No. 48
January 16, 1998                                JQ

THIS DISPOSITION IS NOT
CITABLE AS PRECEDENT OF THE TTAB          MARCH 30, 99
                    U.S. DEPARTMENT OF COMMERCE
                    PATENT AND TRADEMARK OFFICE
                              _____

               Trademark Trial and Appeal Board
                              _____

                      Auburn Farms, Inc.
                              v.
                    McKee Foods Corporation
                              _____

                  Cancellation No. 22,060
                              _____

Don B. Finkelstein for Auburn Farms, Inc.

Donald A. Kaul of Dorsey & Whitney for McKee Foods
Corporation.
                              _____

Before Sams, Seeherman and Quinn, Administrative Trademark
Judges.


Opinion by Quinn, Administrative Trademark Judge:


     Auburn Foods, Inc. (hereinafter "Auburn") has

petitioned to cancel the registration owned by McKee Foods

Corporation (hereinafter "McKee") for the mark JAMMERS for

"filled cakes."[1]

---

[1] Registration No. 1,020,658, issued September 16, 1975; renewed.
The identification of goods originally read "filled cakes,
cookies and fruit pies."  When the registration was renewed, the
renewal affidavit applied to only "filled cakes."  The
registration was changed accordingly.

As grounds for cancellation, Auburn asserts that McKee's registered mark has been abandoned due to nonuse with intent not to resume use.  More specifically, Auburn asserts that there has been no use, by McKee or any predecessor-in-interest, of the mark JAMMERS in connection with the goods listed in McKee's registration for more than two years preceding the filing of the petition.[2]  Auburn further asserts that prior to an assignment of the involved registration from Campbell Taggart, Inc. (hereinafter "Campbell") to McKee, Campbell had not used the registered mark for more than two years, thereby abandoning the mark. Auburn alleges, therefore, that the assignment of the registration to McKee was a naked assignment which invalidates the involved registration.  Auburn also makes the following pertinent allegations:  that Auburn has used the mark JAMMERS since at least as early as April 8, 1992 in connection with fruit juice sweetened cookies; that its application to register this mark was refused registration under Section 2(d) on the basis of McKee's prior registration; that Auburn owns a registration for the mark

---

[2] Section 45 of the Trademark Act was amended, effective January 1, 1996, to extend the minimum period of nonuse to three consecutive years to establish a prima facie case.  However, because the petition for cancellation was filed, and the trial began, prior to that date, the issue of abandonment has been decided on the basis of the pre-1996 statutory provision.  See: Rivard v. Linville, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998), *aff'g*, 41 USPQ2d 1731 (TTAB 1996).

TOAST'N JAMMERS for fruit juice sweetened pastries;[3] and that McKee has claimed that Auburn's JAMMERS and TOAST'N JAMMERS marks are likely to cause confusion with McKee's JAMMERS mark.

McKee, in its answer, denied the salient allegations of abandonment. The answer included a counterclaim to cancel Auburn's registration for the mark TOAST'N JAMMERS under Section 2(d) on the basis that Auburn's mark, when applied to fruit juice sweetened pastries, so resembles McKee's previously used and registered mark JAMMERS for filled cakes as to be likely to cause confusion.[4]

Auburn, in its answer to the counterclaim, maintains that McKee lacks proprietary rights in the mark JAMMERS due to abandonment, and that Auburn's rights in TOAST'N JAMMERS are prior to McKee's rights in FRUIT JAMMERS. Auburn goes on to assert that, in any event, there is no likelihood of confusion between the parties' marks.[5]

---

[3] Registration No. 1,743,417, issued December 29, 1992; combined Sections 8 and 15 affidavit filed.

[4] McKee also refers to its mark FRUIT JAMMERS for "candy fruit snacks," the subject of Registration No. 1,839,545. However, McKee does not specifically plead likelihood of confusion with this mark.

[5] Auburn raises, for the first time in its brief, the claim that McKee's registration was fraudulently maintained due to the filing of a false combined Sections 8 and 15 affidavit. Suffice it to say that this claim was neither pleaded nor tried by the parties as contemplated by Fed. R. Civ. P. 15(b). We sustain McKee's objection to the manifestly late claim and, accordingly, no consideration has been given to Auburn's claim of fraud.

The record consists of the pleadings; the files of the involved registrations; trial testimony, with related exhibits, taken by each party; discovery depositions, with related exhibits, introduced into evidence by the parties' stipulation; official records introduced by way of Auburn's notice of reliance; and Auburn's responses to McKee's interrogatories, and official records introduced by McKee's notice of reliance. The parties submitted briefs and were represented by counsel at an oral hearing held before the Board.

## ABANDONMENT

The material facts in the present case essentially are undisputed. Rather, the controversy in this case centers on the legal implications that arise from those facts. The gist of the parties' respective positions in this case can be summarized as follows. Auburn's theory of the case rests on the alleged nonuse of the registered mark by Campbell from March 1983 to October 30, 1992, the date the registration was assigned to McKee. Auburn contends, therefore, that the assignment was a naked assignment. Auburn goes on to contend that it began use of the mark TOAST'N JAMMERS for fruit juice sweetened pastries in

September 1991, that is, during the period of abandonment of McKee's mark JAMMERS. Auburn maintains that its use predates McKee's first use of the mark JAMMERS for filled cakes in October 1994. Auburn also states that to the extent that McKee was using a JAMMERS mark prior to this date, the mark was FRUIT JAMMERS, a different mark from the JAMMERS mark, for candy fruit snacks, a different product from the filled cakes listed in the involved registration.

McKee counters by contending "[u]nder the circumstances existing in this case, the lack of records and deaths of relevant witnesses make it impossible to either prove or disprove the extent of Campbell's use of the JAMMERS mark." (brief, p. 16) McKee goes on to contend as follows:

> McKee cannot provide any more proof as to Campbell's use than Auburn can provide as to its nonuse. However, the burden rests on Auburn, since it is the party seeking cancellation, and Auburn cannot meet its burden merely by surmising that if Campbell had records, they would show nonuse of the JAMMERS mark. McKee can make exactly the opposite argument, namely, that if Campbell had records, they would show continuing use of the JAMMERS mark. (brief, p. 16)

According to McKee, Campbell never abandoned the registered mark, pointing to Campbell's execution in November 1990 of a consent agreement to use and register in connection with a third-party's attempt to obtain a registration of the mark JUNGLE JAMMERS for animal cracker cookies. McKee also

points, as evidence that the mark was not abandoned, to the very fact that Campbell executed an assignment of the mark JAMMERS in October 1992, with McKee's paying $1,500 in consideration. The assignment, according to McKee, indicates that Campbell must have had rights in the mark at that time or else the assignment would not have been made. McKee goes on to claim that it began its own use of the mark JAMMERS on filled cakes on October 28, 1994, less than two years after it acquired the mark by assignment on October 30, 1992.

### Campbell's Use

Campbell is engaged in the production of baked goods such as bread, cakes, rolls and snacks. Of record are the discovery depositions of Gary Kennedy, plant manager for Merico, Inc. (hereinafter "Merico"), a subsidiary of Campbell, and Richard Witherspoon, senior vice president of sales for Merico.[6] Mr. Kennedy has been employed by Campbell since 1970, and was line superintendent for snack cakes at Merico's plant where JAMMERS snack cakes were produced. Mr. Kennedy testified that the first product produced under the JAMMERS mark at the Merico plant was in 1973. Mr. Kennedy indicated that he did not know if any other facility of Campbell was producing a JAMMERS product

prior to 1973. During his deposition, Mr. Kennedy consulted a production book "that shows the units that we produce and the days we produce them on of every variety in the plant." (dep., p. 24) Mr. Kennedy went on to indicate that the book shows that the last production date of a snack cake under the mark JAMMERS at the Merico plant was March 7, 1983. Mr. Kennedy also indicated that he does not have personal knowledge of any production by Campbell, or by related entities, of any products under the JAMMERS mark subsequent to March 7, 1983, nor does he have personal knowledge why Campbell ceased production of the JAMMERS product.

Mr. Kennedy also indicated that he was not aware of any use of the mark JAMMERS at the time that the registration of the mark was assigned to McKee in October 1992. According to Mr. Kennedy, there is no one in Campbell's employ who can testify as to all uses of the JAMMERS mark by Campbell; the five employees with such knowledge are deceased. Further, at the time of Campbell's headquarters' relocation to St. Louis in late 1993-early 1994, old files were destroyed and, to the best of Campbell's knowledge, the production book represents the only documentary evidence bearing on Campbell's production of any product under the involved mark

---

[6] During Mr. Kennedy's deposition, it was disclosed that Campbell was acquired by Anheuser-Busch which now acts as Campbell's parent company.

7

JAMMERS.[7]  Mr. Kennedy also testified that from March 7, 1983 until the date the registered mark was assigned on October 30, 1992, he did not participate in any discussions about the resumption of use of the JAMMERS mark nor was he aware of any plans by Campbell to resume use.  The witness acknowledged, however, that he would not be informed of such meetings or plans in the normal course of his duties for Campbell.

The record includes a copy of an agreement captioned "consent to use and registration" which was executed in November 1990.  The agreement was signed by Campbell and a third party, Moran Group, Inc., as a result of Moran's attempt to register the mark JUNGLE JAMMERS for animal cracker cookies.  The agreement specifically acknowledges that "Campbell has previously adopted, used, and registered the trademark JAMMERS for the goods of filled cakes, cookies and fruit pies under U.S. Registration No. 1,020,658 issued September 16, 1975."  Campbell consented to Moran's adoption, use and registration of the mark JUNGLE JAMMERS for animal cracker cookies, and Moran subsequently obtained the registration.

---

[7] An attorney from Anheuser-Busch was present at Mr. Kennedy's deposition.  Although the attorney was not sworn as a witness, we note, in passing, the attorney's statement that "all our references to JAMMERS other than the book brought by Mr. Kennedy either no longer exist or we have been unable to locate them." (Kennedy dep., p. 36)

Mr. Witherspoon testified that Auburn, in May 1992, made an inquiry of Campbell as to the possibility of

Campbell's producing Auburn's TOAST'N JAMMERS product.  Mr. Witherspoon also testified that as of that date, Merico was not producing a product under the mark JAMMERS.  Mr. Witherspoon indicated that he was not aware of any other subsidiary of Campbell that produced a product under the mark JAMMERS during the period 1980 through October 1992.

In an assignment document dated October 30, 1992, Campbell assigned the involved registration to McKee.[8] McKee paid $1,500 for the assignment.

### McKee's Use

McKee took the testimony of Joe Davis, McKee's vice president and general counsel, and John Petticord, McKee's creative services manager.

Mr. Davis testified that McKee, around June 1992, selected the mark FRUIT JAMMERS for a candy fruit snack which, according to Messrs. Davis and Petticord, is a different product from pies, cakes and cookies.  Mr. Davis characterized the product as "the same type of product as Gummy Bears....a fruit candy."  In conducting a trademark search to clear the mark, Campbell's JAMMERS mark was discovered.  McKee decided to approach Campbell to acquire the JAMMERS mark and, as indicated above, the involved registration was assigned to McKee on October 30, 1992.  In

10

connection with the assignment, Mr. Davis testified that McKee never requested Campbell to furnish any information or documentation regarding Campbell's use of the mark JAMMERS. Further, Mr. Davis testified that McKee never asked Campbell if Campbell had ever abandoned the mark JAMMERS. Mr. Davis also indicated that at the time McKee acquired the registration by assignment, McKee had no knowledge of any uses of the mark JAMMERS by Campbell or of any goodwill that might have been associated with the mark. Mr. Petticord testified that during his twenty years in the business, he never personally saw any products of Campbell's bearing the mark JAMMERS. Mr. Petticord confirmed that McKee never made any investigation regarding any use of the mark JAMMERS by Campbell.

McKee obtained Registration No. 1,839,545 for the mark FRUIT JAMMERS for "candy fruit snacks." The registration issued on June 14, 1994, alleging dates of first use of October 1992.

With respect to McKee's own first use of the mark JAMMERS, Mr. Davis testified that there was no use in the years 1992 and 1993, but that the first use occurred in October 1994 (more specifically, on October 28, 1994, two days shy of the two year anniversary date of the

---

[8] The assignment was recorded in the records of the Assignment Branch of the Office on November 18, 1992 at reel 0919, frame 947.

assignment). Messrs. Davis and Petticord testified that the JAMMERS mark was used in connection with filled cakes that were sold exclusively in three of McKee's company-owned retail thrift stores located in Hamilton County, Tennessee, Gentry, Arkansas and Stuarts Draft, Virginia. Sales have totaled a few thousand dollars per year. The mark has not been used in connection with cookies or fruit pies. Mr. Davis indicated that the reason for confining sales to these thrift stores is due to McKee's desire to limit the time, effort and money to develop the brand until the present dispute is resolved. McKee's registration was renewed, but with respect to "filled cakes" only ("cookies" and "fruit pies" were deleted).

## Auburn's Use

Auburn took the testimony of Daniel Lang, its chief operating officer, and Robert Luke, Auburn's president. Mr. Lang testified that Auburn first introduced its fruit-filled toaster pastry product under the mark TOAST'N JAMMERS in September 1991 at the Natural Food Expo East in Baltimore, Maryland. Mr. Lang characterized the show as "one of the largest natural food trade shows in the country," and testified that "Auburn had edible slices of the product there for tasting and sampling" and "we took orders at that time." According to Mr. Lang, Auburn

> continued to take orders, send out
> literature, send samples, and generally

> prepare advertising materials for use in connection with the shipments of the product....we actually had a product. We had a formulation. We had tested it. We took samples to the show. We had a manufacturer, New Life Bakery, that had developed the product for us. We had created a logo and advertising....we took, like, actual artwork and mock-up boxes to the show with the Toast'N Jammers logo on it, and we took actual samples to that show and so that the retailers and distributors and brokers and other attendees of the show could taste the product. (dep., pp. 20-21)

Mr. Lang went on to testify that the first shipment of the TOAST'N JAMMERS product occurred in March 1992; sales records show that the first sale occurred in January 1992. As indicated earlier, Auburn sent in May 1992 samples of the TOAST'N JAMMERS product in the TOAST'N JAMMERS packaging to Campbell for the purpose of soliciting a price quote from Campbell for producing this product for Auburn.

Mr. Lang also referred to another product launched in April 1992, fruit juice sweetened fat-free cookies sold under the mark JAMMERS. An application was filed to register the mark JAMMERS, but the application was later abandoned.

According to Mr. Lang, Auburn's TOAST'N JAMMERS product is sold in 85-90% of the country's retail grocery stores, with sales by 1994 exceeding $5 million.

## ANALYSIS

A federal registration of a trademark may be canceled if the mark is abandoned.  Section 45 of the Trademark Act provides, in pertinent part, that a mark is abandoned when the following occurs:

> When its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances.  Nonuse for two consecutive years shall be prima facie abandonment.[9]

A petitioner claiming abandonment has the burden of establishing the case by a preponderance of the evidence. Introduction of evidence of nonuse of the mark for two consecutive years constitutes a prima facie showing of abandonment and shifts the burden to the party contesting the abandonment to show either evidence to disprove the underlying facts triggering the presumption of two years nonuse, or evidence of an intent to resume use to disprove the presumed fact of no intent to resume use.  Imperial Tobacco Ltd. v. Philip Morris Inc., 899 F.2d 1575, 14 USPQ2d 1390 (Fed. Cir. 1990); Cerveceria Centroamericana S.A. v. Cerveceria India Inc., 892 F.2d 1021, 13 USPQ2d 1307 (Fed.

---

[9] See n. 2, supra, regarding the statutory amendment to extend the minimum period of nonuse to three consecutive years to establish a prima facie case.  We also note that the 1988 amendments added to the definition of abandonment in Section 45: "'Use' of a mark means the bona fide use of that mark made in the

Cir. 1989); and Stromgren Supports, Inc. v. Bike Athletic Company, 43 USPQ2d 1100 (TTAB 1997).

We find that Auburn has shown a prima facie case of abandonment due to nonuse for almost ten years of the registered mark by Campbell, the prior owner of the registered mark. Although McKee criticizes the quantum of evidence introduced by Auburn, the simple fact remains that the testimony and supporting documentation bearing on Campbell's nonuse and intent not to resume use stand unrebutted.

The testimony of Messrs. Kennedy and Witherspoon establish that Campbell, through its related company Merico, ceased production of JAMMERS fruit-filled cakes on March 7, 1983. Their testimony regarding the cessation of production is corroborated by the only existing documentary evidence concerning Campbell's production of any product under the mark JAMMERS, namely, the production book introduced during Mr. Kennedy's testimony. The witnesses neither were aware of any one else producing the product under the mark between March 1983 and the assignment in October 1992, nor of any plans by Campbell to resume production.

We also take note of the testimony of Messrs. Davis and Petticord, both of whom work for McKee. Mr. Petticord, one of McKee's managers, testified in April 1996 that he never

ordinary course of trade, and not merely to reserve a right in a

personally saw, during his twenty years in the snack food business, any products of Campbell bearing the mark JAMMERS. Mr. Davis disclosed that in connection with McKee's acquisition of the registration, Mr. Davis never requested Campbell to furnish information or documentation regarding Campbell's use of the mark JAMMERS, nor did he ask Campbell if it had ever abandoned the mark. Mr. Davis, McKee's president, also conceded that, at the time of the assignment, McKee had no knowledge of any uses of the mark JAMMERS by Campbell or of any goodwill associated with the mark.

In rebuttal to Auburn's prima facie case, McKee relies on the November 1990 consent agreement and the October 1992 assignment. McKee would have us conclude that Campbell's execution of these documents evidences the fact, or at least raises an inference, that Campbell had not abandoned the mark JAMMERS.

We do not share this view. Firstly, as a subordinate point, a contrary inference (that is, that the mark was abandoned) just as easily could be drawn from these documents. One could conclude that an owner of a registered mark, knowing that the registered mark was on shaky ground due to nonuse of the mark, might readily give its consent to use and register to another in the hopes of avoiding an

mark."

16

attack on its registration. As for the assignment, one could conclude from the small monetary amount paid for the registered mark here ($1500) that the rights in the mark were of minimal value due to nonuse by the owner.

Secondly, and more signifcantly, the consent agreement and the assignment documents essentially stand alone in the face of all of the other testimony and evidence pointing to March 1983 as the time when use of the mark JAMMERS ceased. Thus, McKee's argument misses the point--the point being that by November 1990 (the date of the consent) and October 1992 (the date of the assignment), the registered mark shown in Registration No. 1,020,658, last used in March 1983, was already abandoned. Further, even assuming that the consent shows an intent to resume use, the problem is that it occurred after the mark was abandoned due to a period of over two years of nonuse (in point of fact, almost eight years of nonuse).

We note that any allegation of current use of the mark was conspicuously absent from both the consent and assignment documents. Although such language is not required,[10] the absence of same in the documents signed by

---

[10] In saying this, however, we would point out that an assignment form appearing in a treatise includes the language "[w]hereas [assignor] has adopted, used and **is using** a mark which is registered in the United States Patent and Trademark Office...." [emphais added] Form No. 18-1, McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 18:14 (4th ed. 1998).

Campbell is consistent with the other evidence of record pointing to nonuse.

We also note that, with respect to the consent agreement, McKee points out that Campbell was careful in requiring Moran to refrain from using the mark JAMMERS, or "except as provided [in the agreement], any trademark which conflicts with U.S. Registration No. 1,020,568 or which is confusingly similar to the JAMMERS trademark." According to McKee, Campbell had no reason to place these restrictions on Moran if, in fact, Campbell had abandoned the mark.

The consent and assignment, however, cannot be viewed in a vaccuum. Rather, these documents must be considered in the context of the entire record. Suffice it to say that when viewed in that context, we simply cannot draw the inference that the documents outweigh the objective evidence of nonuse. That is to say, based on the entire record before us, the proper inference to draw is that there was no use and an intention not to resume use, as opposed to the inference argued by McKee that there was use.

Campbell's abandonment of the mark JAMMERS a number of years prior to the assignment resulted in an invalid assignment (that is, an assignment in gross) since "[a]n abandoned trademark is not capable of assignment." Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 216 USPQ 11, 19 (7th Cir. 1989); and Parfums Nautee Ltd. v. American

International Industries, 22 USPQ2d 1306, 1309 (TTAB 1992). See generally: J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, supra, §§ 18:17-18:19. The facts, in and of themselves, that Campbell assigned the mark and that McKee paid "good and valuable consideration" in the amount of $1500 (a relatively small amount) for the mark are of little significance given McKee's complete lack of knowledge of any uses of JAMMERS by Campbell, and its complete failure to inquire and/or request information relative to any uses.

In reaching our decision, we are mindful, of course, of McKee's argument that "McKee cannot provide any more proof as to Campbell's use than Auburn can provide as to its nonuse." The argument simply misses the mark here. All of the evidence of record points to an abandonment by Campbell. In this connection, we note the instructive language of our primary reviewing court: "Especially when a party must prove a negative, as in proving abandonment through nonuse, without resort to proper inferences the burdened party could be faced with an insurmountable task." Cerveceria Centroamericana S.A. v. Cerveceria India Inc., supra at 1310 The clear inference to be drawn from the evidence is that there was no use of the mark JAMMERS by Campbell after March 1983, and that the use was discontinued with intent not to resume such use. McKee did not commence its own use of the mark until October 1994. McKee's own use of JAMMERS in 1994

19

represents a new and separate use, and cannot serve to cure the abandonment during the time when Auburn commenced its use of the mark. Cerveceria Centroamrericana S.A. v. Cerveceria India Inc., <u>supra</u>; Mission Dry Corp. v. Seven-Up Co., 193 F.2d 201, 86 USPQ 263 (CCPA 1951); AmBRIT Inc. v. Kraft Inc., 805 F.2d 974, 1 USPQ2d 1161 (11th Cir. 1986); and First National Bank of Omaha v. Autoteller Systems Service Corp., 9 USPQ2d 1740 (TTAB 1988).

Although we recognize that the deaths of relevant witnesses and the lack of records complicate McKee's case, that does not relieve McKee of its burden of going forward (burden of production) to rebut Auburn's prima facie case. See: Continental Grain Co. v. Strongheart Products Inc., 9 USPQ2d 1238, 1240 (TTAB 1988). In this regard, we cannot help but specifically note the chronology surrounding McKee's acquisition of the mark from Campbell. The assignment of the registration to McKee occurred in October 1992. The petition for cancellation was served on McKee on November 19, 1993; McKee's answer was filed on December 17, 1993. Campbell relocated its headquarters in late 1993-early 1994, at which time old business records were destroyed. Thus, shortly prior to (or at least contemporaneous with) the time of the destruction of Campbell's records, McKee was aware that its registration was under attack due to an alleged abandonment by Campbell.

One is left to wonder why, at that time in 1993, McKee did not obtain information, whether from Campbell's personnel or documents, as to any evidence bearing on Campbell's earlier use of the mark. We join Auburn's questioning of McKee's assertion that the only persons who could testify and corroborate Campbell's use are dead. As Auburn asks in its brief (p. 4): "Where are the people who were the customers for the product? Where are the people who worked producing the product? Where are the people who made the labels for the product? Where are the distributors or other persons in the chain of distribution for this product?"

In sum, we conclude that Campbell abandoned the mark JAMMERS by virtue of its nonuse after March 1983. The record is devoid of any evidence showing any use or any intention to resume use of the mark by Campbell from March 1983 to October 1992 when the registered mark was assigned. The only evidence in rebuttal to Auburn's prima facie case of abandonment are the consent and assignment documents which are not sufficient to negate the evidence bearing on Campbell's nonuse between March 1983 and October 1992. The assignment occurred after Campbell's abandonment and, moreover, after Auburn's use commenced. McKee commenced its own use of JAMMERS in October 1994. McKee's use is a new use which was subsequent to Auburn's first use in 1992.

To the extent that the parties have discussed the effect of McKee's use of the mark FRUIT JAMMERS on the abandonment of the mark JAMMERS, we find the arguments to be irrelevant. The use of FRUIT JAMMERS did not commence until October 1992 and, in any event, the use was for a different mark on a different product.

Accordingly, the petition for cancellation is granted.

### COUNTERCLAIM

The abandonment of the mark JAMMERS and cancellation of the registration have a dispositive effect on McKee's counterclaim grounded on priority and likelihood of confusion. In seeking to cancel Auburn's registration of the mark TOAST'N JAMMERS for "fruit juice sweetened pastries," McKee claims that Auburn's mark, when used in connection with Auburn's goods, so resembles McKee's previously used mark JAMMERS for "filled cakes" as to be likely to cause confusion.

As found above, Campbell abandoned the mark JAMMERS and, thus, the assignment of the registered mark to McKee is invalid, and McKee cannot rely on the February 18, 1975 filing date of the application which matured into that registration. Mr. Davis admitted that there was no use of JAMMERS by McKee in the years 1992 and 1993, and that first use was not made until October 1994. As to McKee's mark

22

FRUIT JAMMERS, the first use did not occur until October 1992.

The problem for McKee in the counterclaim is that Auburn's first use predates any use McKee can rely on for either mark. As indicated above, Auburn began use of the mark TOAST'N JAMMERS in connection with fruit juice sweetened pastries at a trade show in September 1991. Auburn's activities under the mark leading up to the first shipment of products in early 1992 would appear to be uses analogous to trademark use sufficient to give Auburn priority. But we do not even need this basis to find that Auburn has prior rights. Rather, it is undisputed that Auburn's first shipment of its TOAST'N JAMMERS product took place in the period January 1992-March 1992, that is, a time prior to McKee's first use of either JAMMERS or FRUIT JAMMERS. Even the filing date of Auburn's underlying application (April 27, 1992) is prior to any first use date that McKee can claim in this proceeding. Thus, McKee does not have priority, and its Section 2(d) claim must fail. See: American Standard Inc. v. AQM Corporation, 208 USPQ 840 (TTAB 1980).

Decision: The petition for cancellation is granted and Registration No. 1,020,658 will be canceled in due course. The counterclaim is dismissed.


J. D. Sams



E. J. Seeherman



T. J. Quinn
Administrative Trademark
Judges, Trademark Trial
and Appeal Board